## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ROOFERS' UNIONS WELFARE TRUST FUND, <br><br> Plaintiff, <br><br> v. <br><br> CAREMARKPCS HEALTH, LLC, and CVS HEALTH CORPORATION, <br><br> Defendants. | Civil Action No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

**Page**

I. NATURE OF THE ACTION ................................................................................................ 1

II. JURISDICTION AND VENUE .......................................................................................... 7

III. PARTIES ............................................................................................................................ 7

    A. Plaintiff ................................................................................................................... 7

    B. Defendants .............................................................................................................. 8

    C. Relevant Non-Party CVS Entity ............................................................................ 8

    D. Non-Party Drug Companies Participating in the PBM Fraud Enterprises ............ 9

IV. THE FORMULARY MANIPULATION SCHEME ........................................................... 14

    A. Recent Investigations Revealed the Formulary Manipulation Scheme ................ 14

    B. Caremark's Role as a PBM .................................................................................... 16

    C. Caremark's Contracts with Roofers and the Class................................................ 21

    D. Defendants Created Zinc, a Fake GPO, to Implement the Formulary
        Manipulation Scheme ........................................................................................... 23

    E. During the Class Period, Defendants' Formulary Manipulation Scheme
        Extracted Billions of Dollars in Bribes and Kickbacks to Zinc........................... 27

    F. Caremark Manipulated Drug Formularies In Exchange For The Kickbacks
        Manufacturers Paid To Zinc................................................................................. 32

V. DEFENDANTS FALSELY PORTRAY THEMSELVES AS LOWERING DRUG
    COSTS FOR THEIR CLIENTS ........................................................................................ 37

    A. Misrepresentations By Defendants' Executives and Spokespersons .................... 37

    B. Misrepresentations on CVS' Website.................................................................... 45

    C. Defendants Falsely Told Roofers and Other PBM Customers That
        Caremark's Formulary and Rebate Decisions Were Based on Helping
        Customers Control Costs and Achieve Significant Savings ................................. 48

VI. DEFENDANTS HAVE ESTABLISHED AND OPERATED RICO
    ENTERPRISES IN FURTHERANCE OF THEIR FRAUDULENT SCHEME.............. 51

A.     In Furtherance of Defendants' Fraudulent Scheme, Each of the PBM Fraud Enterprises Made False and Misleading Statements ................................... 56

VII.     CAREMARK BREACHED ITS OBLIGATION TO TREAT ITS PBM CUSTOMERS FAIRLY AND IN GOOD FAITH ........................................................... 57

VIII.     CLASS ACTION ALLEGATIONS ..................................................................... 59

IX.     CLAIMS FOR RELIEF ................................................................................. 61

COUNT I ............................................................................................................... 61

COUNT II .............................................................................................................. 67

COUNT III.............................................................................................................. 69

COUNT IV.............................................................................................................. 70

COUNT V ............................................................................................................... 72

X.     PRAYER FOR RELIEF................................................................................. 72

XI.     JURY DEMAND ......................................................................................... 73

Roofers' Unions Welfare Trust Fund ("Roofers" or "Plaintiff"), which provides health and welfare benefits for members of Local 11 Union of Roofers, Waterproofers and Allied Workers, and the putative class members are pharmacy benefit manager ("PBM") customers of Defendant CaremarkPCS Health, LLC ("Caremark"). Individually and on behalf of the other members of the Caremark PBM customer class (the "Class"), Roofers alleges, upon personal knowledge as to itself and its own acts, and as to all other matters based on investigation of counsel and upon information and belief, the following against Defendants Caremark and its corporate parent, CVS Health Corporation ("CVS," collectively with Caremark, "Defendants"):

## I.   NATURE OF THE ACTION

1.     Caremark is one of the largest PBMs in America, and Caremark describes its "role in the health care system" as "negotiating low net costs for our customers while supporting safe and clinically effective products for consumers." Each year, Caremark PBM customers, including Roofers and the Class, pay billions of dollars to Caremark to cover the prescription drug costs of their tens of millions of beneficiaries.

2.     Caremark has risen to the top of the PBM industry by attracting PBM customers, including Roofers and the Class, with promises to drive down their prescription drug costs by negotiating rebates from drug companies and managing drug formularies. A formulary is a list of drugs available to members of a prescription drug plan. Caremark, through its control of formularies, dictates which drugs its PBM clients, including Roofers and the Class, can cover for their members. Caremark consistently assured its PBM clients that it crafts standard formularies to reduce their drug costs. Further, even when the rare Caremark customer takes on an active role in assessing its own formularies, Caremark still negotiates rebate terms and formulary placement restrictions.

1

3.      Specifically, Caremark promised Roofers, and other Caremark PBM customers, that it would provide significant cost savings by negotiating with drug manufacturers on their behalf to secure rebates, and through formulary management, such as promptly replacing high-cost drugs with low-cost equivalents on Caremark formularies, including its national standard formulary.

4.      In truth, Caremark and CVS, together with CVS subsidiary Zinc Health Services, LLC ("Zinc") and non-party drug companies, orchestrated an elaborate, fraudulent scheme to sell access to its drug formularies—the "Formulary Manipulation Scheme."  As part of this conspiracy, Caremark manipulated its formularies to give access and preferential placements to high-cost drugs, in place of effective low-price drugs.  Caremark implemented this scheme by using its negotiating power to convince drug companies to divert exorbitant payments to its sister company, Zinc, for routine PBM services, rather than using its negotiating power to secure those payments as greater rebates for Roofers and the Class.  This scheme maximizes Defendants' profits while driving up the Caremark PBM customers' prescription drugs cost instead of reducing such costs.

5.      As explained by a former Caremark and Zinc Director, "It was all on paper and it was all transactional money flowing through contracts, there was nothing I had to send to you or sell to you, here buy 500 of these, it was access to the formularies."

6.      The Formulary Manipulation Scheme breaches a core term of Caremark's contracts with Roofers and the Class: that insofar as CVS, Caremark, and their affiliates "may receive and retain compensation" from pharmaceutical companies, such compensation is only "for the provision of services, such as care management, program administration, adverse event and other data reporting, and fulfillment services," rather than for Caremark exploiting and manipulating its control of drug formularies for Caremark's PBM customers.

7. The Formulary Manipulation Scheme also breaches the implied covenant of good faith and fair dealing inherent in the contracts that governed Caremark's provision of services to Roofers and the Class, and unjustly enriched Defendants to the financial detriment of Roofers and the Class. Indeed, CVS's own Code of Conduct defines its duty of fair dealing to prohibit "any conduct or sales or other practice that is intended to mislead, manipulate, or take unfair advantage" of Caremark PBM customers like Roofers.

8. From March 18, 2020, the date of Zinc's creation, to the present (the "Class Period"), Defendants have used the Formulary Manipulation Scheme to withhold from the Class billions of dollars received as kickbacks from major drug companies in exchange for selling access to and favorable placement on Caremark's drug formularies for high-price, brand-name drugs. Rather than negotiating to maximize the rebates to be shared with CVS PBM customers—the primary mechanism by which Caremark promised to deliver lower drug costs for the Class— Defendants instead used their control over Caremark's formularies to direct the drug companies to make payments to Zinc, Caremark's sister company. Defendants falsely label these unlawful bribes and kickbacks as "rebate administration" and other "*bona fide* service" fees for Zinc.

9. Defendants have been able to orchestrate their Formulary Manipulation Scheme by leveraging the negotiating power that Caremark has over drug companies because of its control over the drug formularies used by Roofers and the Class. Instead of using this power to serve the interests of CVS PBM customers as Caremark promised, Defendants abused their leverage to further their own financial interest to the detriment of Caremark PBM customers.

10. The Formulary Manipulation Scheme began in response to pressure applied by Caremark PBM customers for Caremark and other PBMs to share with their PBM clients the

3

payments PBMs received from drug companies, irrespective of whether such payments are called rebates or otherwise labeled.

11. In 2020, to evade having to share with Roofers and the Class the payments it received from drug companies, Defendants created Zinc, a wholly-owned subsidiary. CVS purportedly created Zinc as a group purchasing organization ("GPO") for Caremark's PBM business. Zinc negotiates rebates with drug manufacturers on behalf of Caremark's PBM clients, a task that Caremark itself had previously performed and which is one of the primary tasks for which Roofers and other Caremark PBM customers hire Caremark as their PBM.

12. Defendants then conspired with drug companies to have them pay exorbitant "fees" to Zinc in exchange for access to the Caremark's formularies and beneficial placement in high-paying tiers of those formularies. The fees that Defendants extracted and demanded drug companies pay to Zinc vastly exceeded the fair market value of Zinc's services. Those fees are, in actuality, bribes and kickbacks paid in exchange for Caremark giving formulary access and favorable formulary placements to high-price, brand-name drugs over competing drugs, to the detriment of Roofers and the Class.

13. Zinc, in short, functions as a conduit through which Defendants have collected exorbitant bribes and kickbacks without having to disclose those monies or share them with Caremark's PBM customers, as contractually required.

14. Roofers, the Class, and the public did not and could not know of the Formulary Manipulation Scheme until a series of recent investigations and investigative journalism stories, including investigations by the Federal Trade Commission ("FTC"), the Illinois Attorney General's Office, the House Committee on Oversight and Accountability, and the *New York Times*. Indeed, to conceal the Formulary Manipulation Scheme from Roofers and the Class, Caremark

4

executives falsely assert that Zinc "will be responsible for certain negotiations with manufacturers, but will not make any formulary decisions."

15. To orchestrate the Formulary Manipulation Scheme, Defendants have controlled and operated a series of bilateral RICO enterprises (the "PBM Fraud Enterprises"). Each of the PBM Fraud Enterprises involved, on one side, the Defendants and non-party Zinc, and on the other side, a drug company that paid bribes and kickbacks to Zinc in return for formulary access and favorable formulary placements for its drugs. During the Class Period, nearly every major drug company—including, but not limited to, AbbVie, Amgen, AstraZeneca, Bayer, Bristol-Myers Squibb, Boehringer Ingelheim, Eli Lilly, Gilead Sciences, Johnson & Johnson, Merck, Novartis, Novo Nordisk, Pfizer, and Sanofi—has participated in one of the bilateral PBM Fraud Enterprises.

16. During the Class Period, each of the PBM Fraud Enterprises operated on the basis of agreements and understandings between the CVS entities (Defendants and non-party Zinc) and the participating non-party drug company. Specifically, Caremark, rather than negotiating with the drug company to reduce prescription drug expenditures for Roofers and the Class, instead sold drug companies access to its PBM clients by giving formulary access and favorable formulary placements in return for bribes and kickbacks from the drug company. As part of the scheme, Caremark excluded lower cost drugs from the formularies, to eliminate competition for their drug company co-conspirators. This scheme enriched Defendants to the detriment of Roofers and the Class.

17. Defendants concealed these bribes and kickbacks by arranging for each drug company to funnel the payments to Zinc and to label them as ostensibly legitimate fees. Payments from drug companies to Caremark itself are deemed "rebates" or "administrative fees" that must be shared with Caremark PBM customers, under their contracts with Caremark. By having the

5

drug companies mislabel these bribes and kickbacks as other ostensibly legitimate "fees" paid to Zinc, Defendants avoided having the payments defined as "rebates" and "administrative fees" that they needed to share with Roofers and the Class. Instead, Defendants retained those payments to enrich themselves, to the direct detriment of Roofers and the Class.

18. Defendants' operation of the PBM Fraud Enterprises has directly caused financial losses to Roofers and the Class. *First*, Defendants' scheme of negotiating with drug companies for the payment of billions of dollars to Zinc, falsely labeled as service and other fees, has reduced by billions of dollars the payments that Roofers and the Class received from Caremark as rebates. Instead of using their negotiating leverage to maximize the rebates secured for Caremark PBM customers as they represented they would do, Defendants used that leverage to extract payments to Zinc for their own benefit.

19. *Second*, by selling formulary access and favorable formulary placements to high-price, brand-name drugs in return for bribes and kickbacks paid to Zinc, Defendants violated their contracts with Caremark PBM customers and raised prescription drug costs for Caremark PBM customers. Put simply, Roofers and the Class have had to pay more to Caremark during the Class Period for prescription drug coverage for their beneficiaries as a result of the Formulary Manipulation Scheme.

20. Through this action, Roofers and the Class seek to recover the lost rebates that would have been paid to the Class but for the Formulary Manipulation Scheme, excess costs imposed by the kickbacks that Defendants have fraudulently diverted to Zinc, the higher payments they have had to make to Caremark as result of its bribe and kickback tainted formulary inclusion and placement decisions, and such other relief as authorized by law.

6

## II.      JURISDICTION AND VENUE

21.      This Court has subject matter jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because those Counts arise under the laws of the United States and because Plaintiff was injured in its business and property by reason of a violation of 18 U.S.C. § 1962.  This Court also has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5 million (exclusive of interest and costs) and is a class action in which at least one class member is a citizen of a state different from any defendant.  Defendants CVS and Caremark are incorporated in Delaware and headquartered in Rhode Island, and as such, are citizens of both states.

22.      This Court has personal jurisdiction over Defendants because all Defendants conducted and conduct extensive business in Rhode Island, including the pharmacy benefit management services and GPO services described herein.  Further, Defendant CVS is headquartered in Rhode Island.

23.      Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this District.  Defendants conducted business in this District during the Class Period.

24.      In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including interstate mail and wire communications.

## III.      PARTIES

### A.      Plaintiff

25.       Roofers' Unions Welfare Trust Fund ("Roofers") represents workers' rights in all segments of the roofing and waterproofing industry.  Located in Oak Brook, Illinois, Roofers,

7

among other things, provides health and welfare benefits for members of Local 11 Union of Roofers, Waterproofers and Allied Workers, as well as retired union members and beneficiaries.

26. Throughout the Class Period, Roofers incurred significant costs to pay Caremark for pharmacy benefit manager services and was injured by the conduct alleged in this Complaint.

## B. Defendants

27. CVS Health Corporation ("CVS") is a Delaware corporation and global healthcare company with a principal place of business at 1 CVS Drive, Woonsocket, Rhode Island 02895. It is the parent corporation of Caremark and Zinc as defined below.

28. CaremarkPCS Health, LLC, ("Caremark") is a PBM that manages pharmacy services for health plans, employers, and government agencies. It is a Delaware corporation, with its principal place of business in Woonsocket, Rhode Island. Caremark is a wholly-owned subsidiary of CVS. Caremark provides pharmacy benefit management services to various health insurance entities, including Roofers and the Class.

## C. Relevant Non-Party CVS Entity

29. Zinc Health Services, LLC ("Zinc") is purportedly a group purchasing organization ("GPO") that negotiates rebates with drug manufacturers on behalf of Caremark. It was established in 2020 by Defendant CVS and it is headquartered in Bloomington, Minnesota.

30. The chart below indicates the relationships between Defendants and Relevant Non-Party Zinc:



CVS Vertical Business Relationships:
PBM and GPO

### D. Non-Party Drug Companies Participating in the PBM Fraud Enterprises

31. AbbVie Inc. ("AbbVie") is a corporation organized and existing under the laws of Delaware with a principal place of business at 1 North Waukegan Road, North Chicago, Illinois. AbbVie is a major drug company that manufactures and markets brand-name drugs including Humira, Linzess, Rinvoq, and Skyrizi. During the Class Period, AbbVie regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, AbbVie made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

32. Amgen Inc. ("Amgen") is a corporation organized and existing under the laws of Delaware with a principal place of business at 1 Amgen Center Drive, Thousand Oaks, CA 91320. Amgen is a major drug company that manufactures and markets brand-name drugs including Enbrel, Repatha, and Otezla. During the Class Period, Amgen regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment. As a participant in the

9

PBM Fraud Enterprises, Amgen also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

33.     AstraZeneca PLC ("AstraZeneca") is a corporation organized and existing under the laws of England and Wales with a principal place of business for its United States operations at 1800 Concord Pike, Wilmington, Delaware.  AstraZeneca is a major drug company that manufactures and markets brand-name drugs including Farxiga, Symbicort, Lynparza, and Brilinta.  During the Class Period, AstraZeneca regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment.  As a participant in the PBM Fraud Enterprises, AstraZeneca also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

34.     Bayer AG ("Bayer") is a corporation organized and existing under the laws of Germany with a principal place of business for its United States operations at 100 Bayer Boulevard, Whippany, New Jersey.  Bayer is a major drug company that manufactures and markets brand-name drugs like Xarelto.  During the Class Period, Bayer regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment.  As a participant in the PBM Fraud Enterprises, Bayer also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

35.     Bristol-Myers Squibb Company ("BMS") is a corporation organized and existing under the laws of Delaware, with a principal place of business at Route 206 & Province Line Road, Princeton, New Jersey. BMS is a major drug company that manufactures and markets brand-name drugs including Eliquis, Sprycel, and Zeposia. During the Class Period, BMS regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment. As a

10

participant in the PBM Fraud Enterprises, BMS also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

36.     Boehringer Ingelheim ("Boehringer") is a corporation organized and existing under the laws of Germany with a principal place of business for its United States operations at 900 Ridgebury Road, Ridgefield, Connecticut. Boehringer is a major drug company that manufactures and markets brand-name drugs including Jardiance, Glyxambi, and Spiriva. During the Class Period, Boehringer regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Boehringer also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

37.     Eli Lilly and Company ("Eli Lilly") is a corporation organized and existing under the laws of Indiana with a principal place of business at Lilly Corporate Center, Indianapolis, Indiana. Eli Lilly is a major drug company that manufactures and markets brand-name drugs like Trulicity. During the Class Period, Eli Lilly regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Eli Lilly also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

38.     Gilead Sciences, Inc. ("Gilead") is a corporation organized and existing under the laws of Delaware with a principal place of business at 333 Lakeside Drive, Foster City, California. Gilead is a major drug company that manufactures and markets brand-name drugs including Biktarvy, Descovy, Harvoni, and Vosevi. During the Class Period, Gilead regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment. As a

11

participant in the PBM Fraud Enterprises, Gilead also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

39.     Johnson & Johnson ("J&J") is a corporation organized and existing under the laws of New Jersey with a principal place of business at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey.  J&J is a major drug company that manufactures and markets brand-name drugs including Tremfya and Erleada.  During the Class Period, J&J regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment.  As a participant in the PBM Fraud Enterprises, J&J also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

40.     Merck & Co., Inc. ("Merck") is a corporation organized and existing under the laws of New Jersey with a principal place of business at 126 E. Lincoln Avenue, Rahway, New Jersey.  Merck is a major drug company that manufactures and markets brand-name drugs including Isentress, Januvia, and Verquvo.  During the Class Period, Merck regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment.  As a participant in the PBM Fraud Enterprises, Merck also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

41.     Novartis AG ("Novartis") is a corporation organized and existing under the laws of Switzerland with a principal place of business for its U.S. operations at 1 Health Plaza, East Hanover, New Jersey.  Novartis is a major drug company that manufactures and markets brand-name drugs including Gilenya, Kesimpta, and Xolair.  During the Class Period, Novartis regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Novartis also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

42.     Novo Nordisk A/S ("Novo Nordisk") is a corporation organized and existing under the laws of Denmark with a principal place of business for its U.S. operations at 800 Scudders Mill Road, Plainsboro, New Jersey. Novo Nordisk is a major drug company that manufactures and markets brand-name drugs including Ozempic, Tresiba, and Victoza. During the Class Period, Novo Nordisk regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Novo Nordisk also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

43.     Pfizer Inc. ("Pfizer") is a corporation organized and existing under the laws of Delaware with a principal place of business at 66 Hudson Boulevard East, New York, New York. Pfizer is a major drug company that manufactures and markets brand-name drugs including Cibinqo, Eliquis, Eucrisa, and Ibrance. During the Class Period, Pfizer regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Pfizer also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

44.     Sanofi-Aventis U.S. LLC ("Sanofi") is a corporation organized and existing under the laws of Delaware, with a principal place of business at 100 Morris Street, Morristown, New Jersey. Sanofi is a major drug company that manufactures and markets brand-name drugs including Aubagio, Cerezyme, Dupixent, Lantus, and Toujeo. During the Class Period, Sanofi regularly interfaced with Caremark relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Sanofi also made payments to Zinc in return for access to Caremark's formularies and favorable formulary placements of its brand-name drugs.

## IV.     THE FORMULARY MANIPULATION SCHEME

### A.     Recent Investigations Revealed the Formulary Manipulation Scheme

45.     Beginning in 2024, a flurry of investigations revealed the Defendants' Formulary Manipulation Scheme involving their affiliated GPO, Zinc.[1]

46.     On June 21, 2024, *The New York Times* published an article (the "June 2024 NYT Article") exposing PBMs for prioritizing their own interests, often at the expense of Caremark PBM clients, beneficiaries, and taxpayers.[2]  This article exposed that amid growing pressures on Defendants from Caremark PBM clients to share with them more rebates and manufacturer discounts, Caremark altered its business model and created Zinc as a new avenue to avoid its contractual obligations to share monies with Caremark PBM clients.

47.     On June 24, 2024, the State of Illinois and Caremark entered into a settlement agreement following an investigation into allegations that Caremark had "unlawfully deprived the State" of rebate payments and had also "failed to adequately disclose to [Illinois] the nature or the relationship between Caremark" and Zinc.

---

[1] On January 14, 2021, the United States Senate Committee on Finance released a report that revealed drug companies increased the list price of insulin, in part, to allow them to offer larger rebates to PBMs, in the hopes that their drugs would receive preferred PBM formulary placement. However, during the time that the Senate Finance Committee investigated PBMs, including Caremark, Zinc was in its infancy.  As such, at the time the Senate Insulin Report was released, Roofers, the Class, and the public had no knowledge of Defendants' Formulary Manipulation Scheme alleged herein, which uses Zinc as Defendants' conduit to misclassify rebates and administrative fees and manipulate formularies.  *See* Staff of S. Comm. on Fin., 116th Cong., Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug (Comm. Print 2021), https://www.finance.senate.gov/imo/media/doc/Insulin%20Committee%20Print.pdf ("Senate Insulin Report").

[2] Rebecca Robbins & Reed Abelson, *The Opaque Industry Secretly Inflating Prices for Prescription Drugs*, N.Y. Times, (June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html ("June 2024 NYT Article").

48.     Under the terms of this settlement, Caremark agreed to pay $45 million to Illinois immediately and to make additional payments as required under a "true-up process."  While executed on June 24, 2024, this settlement agreement was not reported publicly until July 23, 2024.

49.     On July 9, 2024, the House Committee on Oversight and Accountability issued a report titled "The Role of Pharmacy Benefit Managers in Prescription Drug Markets" ("House Report").[3]

50.     Also, on July 9, 2024, the U.S. Federal Trade Commission Office of Policy Planning issued an Interim Staff Report titled "Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies" ("FTC Report").[4]  On September 20, 2024, the FTC filed *In Re: Caremark Rx, Zinc, Express Scripts, Evernorth, Medco, Ascent, OptumRx, Optum Rx Holdings, Emisar*, Docket No. 9437 ("FTC Complaint")[5].

51.     Further, Hunterbrook Media ("Hunterbrook"), an investigative and global reporting firm, has conducted an extensive investigation into CVS and Caremark.  Plaintiff's counsel has collaborated with Hunterbrook in aspects of that investigation, and obtained proprietary investigative materials developed by Hunterbrook supporting the allegations herein.  Hunterbrook

---

[3] Staff of H. Comm. on Oversight & Accountability, 118th Cong., Rep. on the Role of Pharmacy Benefit Managers in Prescription Drug Mkts. (Comm. Print 2024), https://oversight.house.gov/wp-content/uploads/2024/07/PBM-Report-FINAL-with-Redactions.pdf (the "House Report").

[4] FTC Off. of Pol'y Plan., Interim Staff Report, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs & Squeezing Main Street Pharmacies (2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf ("FTC Report").

[5] Complaint, *In Re: Caremark Rx, LLC, Zinc Health Services, LLC, Express Scripts, Inc., Evernorth Health, Inc., Medco Health Services, Inc., Ascent Health Services LLC, OptumRx, Inc., OptumRx Holdings, LLC, & Emisar Pharma Services LLC*, FTC Docket No. 9437 (Sep. 20, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/d9437_caremark_rx_zinc_health_services_et_al_part_3_complaint_corrected_public.pdf ("FTC Complaint").

obtained non-public documents and information via a Freedom of Information Act request to the State of Illinois regarding the Caremark settlement agreement.

**B.      Caremark's Role as a PBM**

52.      Caremark manages prescription drug benefits for health insurance plans, employers, and government programs.  As a PBM, Caremark acts as an intermediary between its PBM clients, pharmacies, and drug manufacturers.

53.      Specifically, Caremark PBM customers retain Caremark to maximize savings and constrain their drug expenditures by negotiating favorable rates and rebates with drug companies, and by constructing and managing a drug formulary that prioritizes both efficacy and cost effectiveness to limit expenses.

54.      The PBM industry is highly concentrated and the three largest PBMs (Caremark, Express Scripts, and OptumRx) control approximately 80% of the market.

55.      Defendants have created a massive, purpose-built healthcare conglomerate meant to enhance their own profits at the expense of Caremark PBM clients.  Now, Caremark has significant control over which drugs are available to the millions of patients covered by Caremark PBM clients and the cost of those drugs.

56.      Specifically, Defendants CVS and Caremark are vertically integrated with Zinc, a purported GPO, which creates a consolidated vertical marketplace.

57.      This vertical integration is self-serving and gives Caremark an immense amount of power in the market.  It allows Caremark and its parent, Defendant CVS, to funnel customers to different branches of their multi-faceted organization and leverage their control and negotiating power to implement and profit from the Formulary Manipulation Scheme.

58.      Negotiations between Caremark and drug manufacturers concerning formulary access and placement occur behind closed doors despite David Joyner, president of CVS

Caremark, stating "[Caremark's] work is rooted in greater simplicity and transparency for those who pay for pharmacy benefits . . . ."

59. Decades ago, PBMs were simply administrative service providers. The role of PBMs expanded when they began promising to deliver cost savings to PBM clients by negotiating with drug companies on behalf of PBM customers, developing formularies of approved drugs, and developing reimbursement terms and conditions for pharmacies.

60. Caremark now performs a variety of functions for Caremark PBM clients, including: (1) creating and maintaining formularies, which are lists of covered drugs; (2) using its purchasing power to negotiate pricing and rebates with drug manufacturers, supposedly for the benefit of Caremark PBM customers; and (3) contracting with pharmacies, setting reimbursement terms for drugs dispensed to patients, and processing pharmacy claims for prescription drugs distributed by their vertically integrated specialty pharmacies.

61. The design and management of drug formularies is one of the primary services that Caremark provides to Roofers and the Class. A formulary is a list of covered drugs for the beneficiaries covered by each Caremark PBM customer.[6] Drug formularies are critical tools that Caremark PBM customers use to manage prescription drug benefits for their beneficiaries. For Caremark PBM customers like Roofers, a drug formulary designates which prescription drugs are covered by the Caremark PBM customers.

62. *First*, Caremark designates which drugs are available for coverage. PBMs' drug formularies typically place certain drugs on an "exclusion list." Being on this list effectively excludes a drug from coverage. A drug formulary also can give certain medications "preferred" status vis-à-vis similar medications.

---

[6] Drug formularies also are referred to as "drug benefit policies" or "medical benefit policies."

63.     *Second*, a drug formulary also may have various "utilization management" requirements to condition when Caremark PBM customers have to pay for specific drugs, including step therapy and prior authorization requirements.  Where utilization management requirements are in force, Caremark PBM customers only have to pay Caremark for coverage of a particular drug when a member has met certain criteria.

64.     *Third*, drug formularies typically have a "tier" structure, which categorizes drugs into various "tiers" that correspond with patients' cost-sharing obligations for the drugs, with drugs classified as Tier 1 typically having a lower out-of-pocket cost to patients than those classified as Tier 2, and so forth.  Typically, each formulary has several tiers of non-specialty drugs and a designated tier of drugs that are designated as "specialty."

65.     In short, Caremark's formulary design and management for Caremark PBM customers can effectively determine whether various drugs will be covered by Caremark PBM customers (and therefore be available to their beneficiaries), how much those beneficiaries pay Caremark for each drug, whether multiple, competing drugs will be available to a patient with a given condition, and whether a patient will need to meet certain requirements, such as obtaining a specific authorization or trying other drugs, before obtaining coverage for a given drug.

66.     Caremark claims to develop and review its formularies via a Formulary Review Committee, which "is an internal CVS Caremark committee responsible for evaluating business factors that can affect a formulary, such as utilization trends, the potential impact of generic drugs or drugs slated to become available over the counter, brand and generic pipeline, line of business, plan sponsor cost, applicable manufacturer agreement, and the potential impact on members."  The Formulary Review Committee then supposedly makes a recommendation to Caremark's National Pharmacy & Therapeutics ("P&T") Committee, which must approve all recommendations before

18

they can be included on a formulary. The P&T Committee claims to be an independent advisory board that bases its decisions on "scientific evidence, standards of practice, peer-reviewed medical literature, accepted clinical practice guidelines, and other appropriate information." However, this is far from the truth. The House Committee found that "each PBM [including Caremark] places strong considerations on the financials of a medication when determining what tier to place the medication."

67.     For drug companies, the formulary of a major PBM like Caremark is the gateway to Caremark PBM customers that provide and pay for health benefits for millions of patients. Those individuals that receive their prescription drug benefits through a Caremark PBM customer generally cannot access a company's drug if it is not on Caremark's formulary, and may face hurdles to access a drug where utilization management measures are applied. Additionally, placing a drug on a more favorable formulary tier—at a lower out-of-pocket cost to patients—than a competing drug to treat the same condition may shift sales to the favored drug. Accordingly, drug companies are dependent upon Caremark's inclusion of the drug on its formularies, and placement on a favorable formulary tier vis-à-vis competing drugs, to access the broadest market for their drugs. For Caremark PBM customers, the inclusion and favoring of high-cost drugs drives up the cost of the drug benefit they provide to their members and beneficiaries.

68.     The direct and powerful impact that Caremark's formulary inclusion and placement decisions can have on the utilization and sales of prescription drugs have long been recognized. As early as 2016, for example, *Barron's* explained that when "CVS Health . . . and Express Scripts . . . released their formulary exclusion list[s]," it made "some waves" in the healthcare industry. This is because the "coverage list determines whether millions of privately insured individuals can

19

easily use an insurance co-payment to buy their prescription [drugs]." More specifically, when "a drug is excluded, it can dramatically hobble sales" of that drug.

69. The House Committee on Oversight and Accountability recognized that if a specific drug is "included on a formulary, especially in a lower tier, [it] means that more people will have access to [that] drug at lower costs."

70. Further, as Caremark has long known, the impact of formulary placement on drug sales gives it enormous negotiating power with drug companies. For example, a 2018 article in *STAT*, an influential healthcare industry publication, described PBMs as "the [healthcare] industry's heavyweights" that wield "enormous power over the availability and pricing of essential medicines." Defendants used this knowledge to create and execute the Formulary Manipulation Scheme through the PBM Fraud Enterprises.

71. Moreover, a September 2023 analysis in *JAMA Health Forum*, a publication of the American Medical Association, found that Caremark and other major PBMs can "affect the financial interests of various stakeholders," including "drug manufacturers." Specifically, "PBMs have control over branded drugs' sales volume through formulary designs and utilization management."

72. In addition to designing and managing drug formularies, Caremark, as a PBM, also agrees via contract to negotiate drug prices with drug manufacturers on behalf of Caremark PBM clients. While negotiating, Caremark purports to achieve cost savings for its PBM clients by having manufacturers agree to refund of a portion of the purchase price paid for the drug.

73. These refunds, known as "rebates," (and sometimes "administrative fees") are paid by the drug companies to Caremark, which then shares the rebate payments with Caremark PBM clients. Historically, PBMs kept the balance of the rebate for themselves but, over time, Caremark

20

PBM customers have successfully bargained with Caremark (and other PBMs) to remit the majority of such rebate payments to their PBM clients.

74. As both public reporting and government investigations have found, the three major PBMs, including Caremark, leverage the negotiating power arising from their control of drug formularies to obtain different forms of payments from drug companies.

75. Congressional investigations confirm the existence of "a clear financial incentive" on the part of drug companies "to secure access" to drug formularies, "especially in a lower tier." As the House Committee on Oversight and Accountability recently explained, paying for formulary access "is even more important" for "health conditions and diseases . . . that can be treated by several similar drugs."

76. During the Class Period, Caremark claimed it manages prescription drug plans for more than 100 million lives through their PBM clients, which includes employers, health insurers, unions or public programs, like Roofers and the Class.

77. Given that Caremark negotiates on behalf of approximately 100 million lives, Caremark's powerful leverage should have enabled it to negotiate the maximum possible rebates for Caremark PBM clients. Instead, Defendants used that leverage to enrich themselves by selling formulary access and formulary placement to the highest bidder, with Zinc as a vehicle to receive kickbacks from manufacturers.

**C.      Caremark's Contracts with Roofers and the Class**

78. Roofers contracts with Caremark to provide PBM services to Roofers in a manner that lowers Roofers' prescription drug spend. All other members of the Class contract with Caremark for the same purpose.

79. Since January 2019, Roofers has maintained a Prescription Benefit Services Agreement with Caremark (the "Caremark PBM Services Agreement"). Most terms of Roofers'

21

Caremark PBM Services Agreement are not unique to Roofers; rather, they are part of the standardized contract used by CVS and Caremark with Caremark's PBM customers.

80. Section 7.1 of the Caremark PBM Services Agreement in effect in 2019 specified that Caremark would "contract with pharmaceutical companies for Rebates as a group purchasing organization for the [Caremark PBM customer]."

81. When Defendants amended the Caremark PBM Services Agreement in late 2021, *i.e.*, over a year after they had created Zinc to divert rebate payments, Defendants again stated, in Section 7.2 of the agreement, that Caremark "may elect, in its discretion to pursue Rebates as a group purchasing organization for the [Caremark PBM customers]." To emphasize Caremark's responsibility to pursue rebates for Caremark PBM customers, Section 7.2 further specified that "CVS/Caremark shall have the exclusive right to pursue rebate on drugs dispensed to Plan Participants" and expressly prohibited Caremark PBM customers from using any GPO other than Caremark "for the purpose of obtaining rebates or discounts related to the drug utilization of Plan Participants."

82. Finally, under Section 7.4 of the Caremark PBM Services Agreement, Caremark promised Caremark PBM customers, including Roofers, that while CVS, Caremark, and their affiliates "may receive and retain compensation" from pharmaceutical companies, such compensation is only "for the provision of services, such as care management, program administration, adverse event and other data reporting, and fulfillment services," not for Caremark exploiting and manipulating its control of drug formularies of its Caremark PBM customers. As such, despite Caremark's assurances to its PBM clients that it only received payments for legitimate services, Caremark used Zinc to secretly receive compensation from drug companies, in the form of bribes and kickbacks, and such compensation directly impacted Caremark's

22

formulary decisions. As such, Caremark committed an express breach of its contracts with Roofers and the Class.

### D. Defendants Created Zinc, a Fake GPO, to Implement the Formulary Manipulation Scheme

83. Defendants created Zinc on March 18, 2020, as a wholly owned subsidiary of CVS. Zinc is headquartered in Bloomington, Minnesota. Of note, in 2019, Express Scripts, one of the other three major PBMs and a direct competitor of Caremark, created a subsidiary called Ascent Health Services LLC as a purported GPO to avoid rebate sharing and further manipulate formularies.

84. Rather than having Caremark itself negotiate on behalf of its clients as a GPO (as it had done until the creation of Zinc, and as provided for in Caremark's contracts with the Class), Defendants CVS and Caremark created Zinc to negotiate with drug manufacturers and receive fees that would not be shared with Caremark PBM customers as rebates or administrative fees. That is, Zinc was created to perform the primary function (negotiating drug prices with manufacturers) that Caremark PBM customers retained Caremark to perform, that Caremark promised to perform, and which Caremark itself had been performing prior to the creation of Zinc.

85. Defendants have disguised payments from drug companies that would be deemed "rebates" if paid directly to Caremark. This allows Caremark, through Zinc, to extract payments from drug manufacturers in exchange for formulary access and placement and to funnel monies it contractually agreed to pay Caremark PBM clients to Defendants.

86. In other words, Zinc is a "GPO" in name only. Traditionally, GPOs purchase drugs and other medical supplies on behalf of a group of health care providers like hospitals. By aggregating a large group of purchasers, a typical GPO providing bona fide services to a group of clients gains additional leverage to secure better pricing. However, Defendants did not aggregate

23

purchasers in creating Zinc, defying the logic of a GPO. Zinc is a wholly-owned subsidiary of CVS, and only negotiates on behalf of Caremark, and thus does not provide for more leverage than Caremark would negotiating for itself. Even Amy Bricker, former Express Scripts President and co-founder of the fake foreign GPO, Ascent Health Services, criticized Zinc as a GPO, claiming that Zinc could not possibly be a GPO if CVS was a sole owner.

87. Moreover, Zinc's role of negotiating contracts, including rebates, with drug companies, simply replicates a task Caremark previously conducted itself on behalf of its clients. As described by a former Senior Director at PBM Prime Therapeutics, "I haven't heard anybody who was happy about [the rise of PBM owned GPOs] because I haven't heard that they're getting any services that are different than what they had before. What are you paying more for? What's the value?" A former Caremark and Zinc Director even stated, "You really don't know a PBM from a GPO because there is no difference. . . . Think of the PBM/GPO as one entity."

88. Indeed, negotiating drug prices on behalf of Caremark PBM clients as a GPO was a core, stated responsibility that Caremark assumed under the Caremark PBM Services Agreement. There was no legitimate purpose for Defendants to form a separate GPO and assign to it the critical responsibility of negotiating drug prices and rebates that was previously handled by Caremark itself.

89. While Defendants have falsely claimed that drug companies pay Zinc for providing bona fide GPO services or rebate administration services, neither is the true reason for the exorbitant payments received by Zinc. Instead, drug companies have made those payments in return for Caremark giving them access to and preferential placement in the formularies of Caremark's PBM customers, and for excluding lower-priced competing drugs from the

24

formularies, all of which Defendants did for their own benefit and to the detriment of PBM customers like Roofers.

90.     The true nature of the payments made to Zinc, a key component of the Formulary Manipulation Scheme, was revealed through findings of recent investigations.  As the FTC found, Zinc is very different from the "traditional GPOs that purchase drugs and other medical supplies on behalf of the health care providers like hospitals."  Instead, Zinc merely took over some of the tasks that Caremark, as a PBM, had "historically engaged in directly."

91.     In fact, while Defendants claim to have created Zinc as a nominally independent and separate entity, a former executive who held roles at Caremark and Zinc explained to Hunterbrook that "[t]here was literally a temporary wall put up between Zinc and Caremark, no separate building, no hardcore cut, Zinc and Caremark reported to the same VP."  This lack of separation between Caremark and Zinc further reveals that Zinc was simply created to siphon payments from drug manufacturers to Defendants, at the expense of the Class.

92.     While Defendants claim that Zinc offers various administrative or data services, the clear disparity between Zinc's meager operations, space, and staffing and the enormous payments that it has received from drug companies shows that Zinc is mainly a vehicle used by Caremark and CVS to sell access to Caremark PBM customers.

93.     Specifically, according to the former Zinc executive, Zinc "probably had 10 negotiators, 2 senior directors . . . I don't think it's changed much, [maybe now] 20-30 people."

94.     Further, when investigative journalists visited Zinc's headquarters in 2025, they found it consists of a single empty office suite within an office space that was primarily occupied by CVS employees.  The office was locked on both occasions, and not a single Zinc employee was present on either occasion.

25

95.     According to the CVS employees present in adjacent offices, they only "occasionally" saw any Zinc employee.  Further, while the CVS employees claimed that Zinc operates as "a separate business owned by CVS," they were unable to provide any contact information for Zinc.

96.     For operating an empty office suite with a handful of scattered employees, Zinc has received billions of dollars from drug companies for providing alleged "bona fide services."  As the June 2024 Illinois settlement shows, and as analysis by public health experts corroborate, Zinc has extracted hundreds of millions, possibly billions, in payments from drug companies each year. This amounts to tens of millions of revenue for each Zinc employee.  By comparison, the revenue per employee at Apple, Inc.—the world's most profitable and valuable company in 2024—is estimated to be about $2.38 million.

97.     A former Senior Vice President at OptumRx, another leading PBM that created its own fake GPO called Emisar, explained that PBMs like Caremark and OptumRx do not need a GPO to provide the volume needed to negotiate better prices from manufacturers, stating: "Historically, a group purchasing organization has been a banded group of like organizations that combine their purchasing agreements in order to get a better deal because of higher volume.  That's the traditional GPO."  In contrast, the new "GPOs" created by major PBMs "are much more sophisticated than that.  If you look at them, whether it's Ascent, Emisar, Zinc, it's not necessarily building a volume.  These three PBMs already have high volume.  CVS has a high volume.  Optum has a high volume.  ESI has a high volume. . . . What they're doing to make money is really providing contacting and aggregation services for PBMs so they can get more money from drug manufacturers." These new PBM-created GPOs "can get new revenue sources from manufacturers that aren't called rebates, such as administration fees, data services fees, portal fees, compliance

fees . . . . They're really generating revenue in fees that aren't fully shared with PBM clients and maybe provide PBMs with a hedge against potential reform of pricing practices."

98. In short, contrary to what Defendants CVS and Caremark may claim publicly, Zinc has not been receiving "bona fide service payments." The truth is that Zinc is not really a GPO, and the billions it receives from drug companies are kickbacks tied to Defendants' Formulary Manipulation Scheme rather than legitimate fees. As reported in the June 2024 NYT Article, "[t]he largest PBMs recently established subsidiaries that harvest billions of dollars in fees from drug companies, money that flows straight to their bottom line and does nothing to reduce health care costs."

**E.      During the Class Period, Defendants' Formulary Manipulation Scheme Extracted Billions of Dollars in Bribes and Kickbacks to Zinc**

99. Given the disparity in knowledge and expertise, and the enhanced cost of creating a customized formulary, Caremark's PBM clients do not have the ability to effectively craft or modify formularies on their own. Even if Caremark PBM clients opt for a customized formulary, which is a mere 11 percent of Caremark clients, Caremark has enormous influence and control over the process of creating and revising such formularies.

100. Caremark represented that as a "PBM, we have a formulary that looks at both clinical efficacy as well as driving low net cost for our customers." In reality, Caremark considers its own potential profit when structuring formularies, rather than just making formulary decisions based on therapeutic benefit or affordability. This is in stark contrast to Caremark's representation that "at the core of what we do, it's to drive the lowest net cost for our pharmacy benefit members. And that's how we evaluate, how we put things on the formulary, the contracting that we have with our manufacturers, and that's what our goal is."

27

101.    As the settlement with the State of Illinois revealed, CVS, Caremark, and Zinc orchestrated an arrangement with drug companies that allowed them to defraud Caremark PBM clients.    The Illinois Attorney General alleged that some payments Zinc received from manufacturers should have been considered rebates, but were not treated as rebates by Caremark. Further, the Illinois Attorney General alleged that Caremark failed to pass through manufacturer rebates, as required by its contract with Illinois, and that Caremark did not adequately inform the state about the relationship between Caremark and Zinc, nor how this would impact manufacturer payments and rebate pass-through.    As a result of Caremark's fraud and conspiracy with manufacturers, Illinois lost millions of dollars that it should have received in rebates.

102.    In other words, Zinc's function within the PBM Fraud Enterprises was to receive the bribes and kickbacks paid by drug companies that, if paid directly to Caremark, would have been deemed rebates under the terms of Caremark's contract with its PBM clients, and which the Defendants would have to share with the Class.

103.    By channeling bribes and kickbacks from drug companies through Zinc, Defendants have been able to limit the transparency that Caremark provides Roofers and the Class in these payment arrangements.  For example, Caremark does not disclose to its PBM customers the payment terms between Zinc and drug companies relating to Zinc's supposed rebate administration services on Caremark's behalf.  Defendants also do not allow Roofers and the Class to examine the payments from drug companies to Zinc pursuant to Caremark PBM customers' contractual audit rights.

104.    Freed from scrutiny by Caremark PBM customers, Defendants have conspired with Zinc and non-party drug companies to divert billions of dollars that would otherwise have been paid to Caremark as "rebates" and "manufacturer administrative fees"—and passed through to

28

Caremark PBM customers pursuant to Caremark's contracts with those customers—to Zinc so that Caremark would not have to share those payments with Roofers and the Class. While the exact amount of monies in rebates withheld from Illinois by Caremark is not clear from the documents received from the FOIA request to the State of Illinois, the $45 million settlement agreement indicates the magnitude of the rebate payments from drug companies that Defendants have been diverting through Zinc into their own pockets.

105. A report by the Community Oncology Alliance explains, "PBMs have increasingly 'delegated' the collection of manufacturer rebates to 'rebate aggregators' [GPOs], which are often owned by or affiliated with the PBMs, without seeking authorization from plan sponsors and without telling plan sponsors. . . . In both the private sector and with respect to government health care programs, the contracts regarding manufacturer rebates (i.e., contracts between PBMs and [GPOs], as well as contracts between PBMs, [GPOs,] and pharmaceutical manufacturers) are not readily available to plan sponsors." Indeed, the Community Oncology Alliance found that "PBMs employ exceedingly vague and ambiguous contractual terms to recast monies received from manufacturers outside the traditional definition of rebates, which in most cases must be shared with plan sponsors. Rebate administration fees, bona fide service fees, and specialty pharmacy discounts/fees are all forms of money received by PBMs and [GPOs] which may not be shared with (or even disclosed to) the plan sponsor. These charges serve to increase the overall costs of drugs, while providing no benefit whatsoever to plan sponsors."

106. A recent investigation by the FTC reached similar conclusions about Defendants' improper diversion of rebate payments using Zinc. After analyzing documents and data produced by Caremark and Zinc, the FTC stated in its July 2024 report that Caremark and its peer PBMs

formed "rebate aggregators" like Zinc for purposes of "retain[ing] revenue from incremental fee structures."

107. Specifically, the FTC highlighted the fact that "rebate aggregators" like Zinc have introduced "novel fees" such as "data/portal fees" and "vendor fees" to collect money from drug companies. As a result, the FTC noted, healthcare analysts have estimated that Caremark and its peer PBMs "have extracted from drug manufacturers billions of dollars in additional fees, which nearly doubled from approximately $3.8 billion in 2018 to $7.6 billion in 2022."

108. Such fees barely existed before the creation of purported GPOs like Zinc. For example, data and data portal fees obtained by PBMs and PBM contracting entities in the US increased from just 0.03% of commercial sales in 2019, the year Ascent (the GPO created by PBM Express Scripts) was created, to 0.56% in 2022, two years after Defendants formed Zinc. From 2018, before the creation of both Zinc and Ascent, the combination of administrative fees, contracting entity vendor fees, data/portal fees and supplemental or uncategorized fees increased from 3.43% of U.S. commercial brand sales to 4.39% in 2022, despite the decline in administrative fees over this same period.

109. Recent interviews with former CVS and drug company executives lay bare the predatory nature of the fees that Defendants have made drug companies pay to Zinc.

110. A former executive at a major drug company, for example, explained to *The New York Times* that his responsibilities at the drug company included negotiating with entities like Zinc. According to this former drug company executive, he had a set pool of money to cover both rebates and fees for entities like Zinc, and when he was asked to pay more in fees, he offered less in rebates. As this former drug company executive recognized, health plans and other PBM

customers were entirely unaware of this trade-off because the plans could not see the billions of dollars in fees that were paid to and retained by entities like Zinc.

111.    As explained by a former anonymous Caremark and Zinc Director, "It was all on paper and it was all transactional money flowing through contracts, there was nothing I had to send to you or sell to you, here buy 500 of these, it was access to the formularies."

112.    A former Senior Vice President at UnitedHealth Group, which owns its own leading PBM, explained that when the PBM customers' demand for a greater share of rebates forced PBMs like Caremark to question "How do I preserve my profitability," the response was "moving from what we're calling rebates to administrative fees, these new revenue sources. You can call them admin fees, data services fees, compliance fees, etc., in order to extract either the same money from drug manufacturers or additional money from drug manufacturers." The former Senior Vice President expanded on those "new revenue sources" to say "you can call them whatever you want. You can call them compliance fees, you can call adherence fees, you can call them data fees, whatever. I like humor as well. It's essentially: how do we shake down pharma for more money?"

113.    According to that same former UnitedHealth Group Senior Vice President, the fees extracted from drug companies by GPOs like Zinc directly impact the price of drugs:

> GPOs are just another middleman. They're just another middleman. They're taking a piece out. Pharma manufacturers just build this into their pricing. . . . When they're doing their pricing modeling, part of the pricing modeling is what is the value of this drug, but they also look at, 'Hey, I've got to pay up 300 basis points to the GPO. I'm going to have to pay another 2% in, let's call it, administrative fees or compliance fees or whatever it is. I got a 5% here. When it gets down to the PBM, I'm paying another 3% or 5% to them. Hey, they're going to nick me on [formulary] tier structure, so I may have to pay another 5%.

114.    The impact of Defendants' extraction of ever-increasing fees from drug companies was corroborated by a former Director at Caremark and Zinc, who explained that "[the GPO fees are] non-negotiable fees. If [a manufacturer] pushed back on it, say you were a Pfizer and you go

31

'We're only [going to] pay you half a percent on the data. That's what our attorneys say it's worth from a fair market value.' [Zinc] would go 'Ok' and they'd hang up the phone. They wouldn't even send them a contract. So, CVS controls like 20-25% of lives, and you're sitting there as a marketing person and you're like, 'What do you mean I'm not getting a contract?' . . . [T]hey just wouldn't contract. And they'd say, 'Well you didn't want to pay our fee.' So, they say we're not [going to] contract, which blocks your products from getting on formulary. And [Zinc] called it 'bringing customers into compliance.' Are you compliant with their contracts, or are you noncompliant? If you're noncompliant, you're trying to say I'm not [going to] pay the fees. So, [] I saw no one, no pharma company, negotiate these fees down."

115. Indeed, the value of drug company payments to the PBMs was highlighted during the 2023 Senate Hearing. Executives from Sanofi, Eli Lilly, and Novo Nordisk testified that $0.75 to $0.84 of every dollar spent on the list price of many of their drugs goes directly to PBMs or their affiliated GPOs.

116. At that hearing, the CEO of Eli Lilly, David Ricks, stated that securing positions on PBM formularies "requires [drug] manufacturers to pay ever-increasing rebates and fees" and Eli Lilly paid "$1 billion in fees" in a single year "to ensure our medicines were covered."

**F.** **Caremark Manipulated Drug Formularies In Exchange For The Kickbacks Manufacturers Paid To Zinc**

117. In the June 2024 NYT Article, a former executive of a major drug company, whose responsibilities included negotiating with GPOs, explained that he had a set pool of money to cover fees paid to GPOs and rebates to the PBMs' customers. When he paid a GPO more in fees, he offered less in the rebates that went to the PBMs' clients, who were entirely unaware of the billions of dollars in fees that the GPOs reaped for themselves.

118. While drug companies do not care about how their pool of funds is divided between GPO fees and rebates to PBM clients, what drug manufacturers do care about is keeping their brand-name, high-priced drugs on Caremark's formularies. This is what Defendants offered drug companies in return for the billions of dollars paid to Zinc.

119. The House Report documented the impact of formulary placement on PBM customers' costs, identifying 300 examples in which Caremark and the two other leading PBMs preferred medications that cost at least $500 more per claim than a comparable medication excluded from their formularies.

120. A study conducted by the Drug Channels Institute shows the drastic increase in the number of products excluded from PBM formularies from 2012 to 2025:



In addition, the FTC reviewed a number of contracts and internal documents summarizing contracts with drug companies, which revealed that some PBM contracts with drug

companies explicitly premise high rebates on the exclusion of AB-rated generics.[7]   The FTC similarly reported that "PBMs and brand pharmaceutical manufacturers sometimes enter into agreements to exclude generic drugs and biosimilars from certain formularies in exchange for higher rebates from the manufacturer."

122.     Defendants' handling of formulary placement for Humira, AbbVie's rheumatoid arthritis drug, when biosimilars of Humira began entering the market in 2023, illustrates this aspect of the pay-for-play arrangement.  In 2023, Humira's list price was approximately $80,000—vastly higher than the prices of biosimilars.  Tellingly, Defendants only began giving a Humira biosimilar a more favorable formulary placement to Humira *after this became more profitable to CVS*. Defendants did not provide comparable, cheaper biosimilars until they launched Cordavis, yet another subsidiary of CVS, which sources medications from other companies and distributes them under its own label.

123.     Additionally, a 2023 Senate hearing revealed that when drug company Viatris released a generic drug, Semglee, at a 65% lower list price to the expensive, brand name drug equivalent, Lantus, PBMs, including Caremark, excluded Semglee from their formularies.  When Viatris subsequently rereleased the exact same product at a higher price (only 5% lower than Lantus), the major PBMs, including Caremark, then added Semglee onto many of their formularies.

124.     The June 2024 NYT Article found "[e]ven when an inexpensive generic version of a drug is available, PBMs sometimes have a financial reason to push patients to take a brand-name product that will cost them much more."

---

[7] The FDA designates a pharmaceutical product as "AB" if there is adequate scientific evidence that it is an adequate bioequivalent to a selected reference product.

125. Analysis cited by the Association for Accessible Medicines ("AAM"), in a comment letter to the FTC, highlights how PBMs, including Caremark, use their control of formularies to exclude cheaper generic drugs and biosimilars. AAM urged the FTC to examine PBMs' practice of "placing generic drugs on non-generic formulary tiers and preferring high-cost drugs over lower priced alternatives," citing "a consistent trend whereby PBMs placed more generics on non-generic tiers with higher cost-sharing," based on research by independent health care consulting firm Avalere Health. This "allows PBMs to generate additional revenue."

126. The AAM comment letter states that "PBMs Block Access to New Generic Drugs and Biosimilars to Increase Revenues," explaining that "[d]espite the ability of generics and biosimilars to drive reductions in costs, preferential tier placement for brand drugs still limits the availability of low-cost prescription drug options." The letter continues:

> FDA-approved generics and biosimilars may not be placed on a formulary at all, making them completely unavailable to patients even though these medicines are available and less expensive than their brand-name drugs counterparts . . . PBMs may dictate plans' decisions on which medications are covered on their national formulary, including the ability to recommend which products are excluded. In 2021, 1,343 drugs were excluded by formularies as required by the three largest PBMs. Often, the excluded products are biosimilars with lower prices. Formulary exclusions often work against the financial interests of patients, for example when the excluded medications have a lower list price than those that remain on formulary.

127. These and other examples led the House Committee on Oversight and Accountability to conclude in the House Report that Caremark is incentivized to include on its formularies higher priced drugs over lower priced generic drugs, in order to enhance its own profits. The House Report cites evidence that, when designing formularies, Caremark, along with the other major PBMs, often made decisions based on the profitability to Defendants, rather than the benefit to patients or affordability to Caremark's PBM clients.

128.     The FTC Report found evidence that PBMs, such as Caremark, and drug companies negotiate and enter into agreements to exclude generic drugs and biosimilars from certain formularies. The FTC concluded that "rebates and fees may shift costs and misalign incentives in a way that ultimately increases patients' costs and stifles competition from lower-cost drugs, especially when generics and biosimilars are excluded or disfavored on formularies."

129.     Even when Caremark does choose to include a generic, it is because Caremark can turn a major profit at the expense of its PBM customers. Reflecting this, the June 2024 NYT Article reported that "[PBMs] sometimes push patients toward drugs with higher out-of-pocket costs, shunning cheaper alternatives." The June 2024 NYT Article further reported that "[i]n Oklahoma, for example, CVS's PBM, Caremark, overcharged the health plan for state employees by more than $120,000 a year for one patient's cancer drug, according to his insurance documents."



### Overcharging for a Cancer Drug

CVS Caremark charged Oklahoma far more than the wholesale cost for everolimus.

| Price charged by CVS Caremark | $138,000 per year |
| Wholesale cost for a local pharmacist | $14,000 |

Sources: Patient's insurance paperwork; drug wholesaler database · By Ella Koeze

130.     Thus, instead of prioritizing medications that result in lower costs for its clients, Caremark prioritizes its own financial benefit when designing its formularies by selecting higher cost drugs that generate kickbacks to Zinc.

131.     Additionally, Caremark's use of outright formulary exclusion has accelerated rapidly. In 2024, Caremark excluded 644 drugs from its formularies. More broadly, the number of medicines excluded from the formularies of the three largest PBMs (including Caremark)

increased 961% from 2014 (109 unique drug exclusions) to 2024 (1,156 unique drug exclusions). This evidences Defendants' abuse of Caremark's role as gatekeeper by increasingly excluding lower-priced (yet safe and effective) drugs from its formularies so that it can sell formulary access and placement to drug manufacturers to fuel Defendants' profits.

132.    Moreover, as evidenced, Defendants manipulated Caremark's formularies by giving drug manufacturers formulary access or favorable formulary placement in return for kickbacks paid to Zinc.

## V.    DEFENDANTS FALSELY PORTRAY THEMSELVES AS LOWERING DRUG COSTS FOR THEIR CLIENTS

133.    For decades, Defendants marketed Caremark's PBM business to Caremark PBM customers by claiming to "negotiate lower costs of prescription drugs."  Defendants have also routinely asserted in public statements that Caremark's drug formulary design and drug rebate negotiations aim to lower the prescription drug expenditures of Caremark PBM customers, and that Caremark is dedicated to being transparent with Caremark PBM customers regarding payments and costs.  Throughout the Class Period, and especially after the publication of the June 2024 NYT Article, the FTC Report, and the House Report, Defendants received public scrutiny for their role in increasing drug prices.  Yet, both before and after the 2024 public scrutiny, Defendants continuously describe their incentives as being aligned with Caremark PBM customer—*i.e.*, that Defendants will share the benefits of reduced drug prices and increased rebates with Caremark PBM customers.

### A.    Misrepresentations By Defendants' Executives and Spokespersons

134.    In an August 5, 2020, earnings call with stock analysts, Eva C. Boratto, then Executive VP & CFO of CVS, stated:

- Additionally, to further assist our clients, in the second quarter, CVS Health launched Zinc Health Services, allowing us to deliver new, innovative ways

to further reduce the cost of brands and specialty drugs. This new entity will be responsible for certain negotiations with manufacturers, but *will not make any formulary decisions*. While we have continuously worked with industry pharmaceutical manufacturing leaders to lower cost and deliver greater savings, this new approach will give us even greater flexibility and agility to continue in those efforts. This approach will ultimately help make medications more affordable for our clients and members.

- We did not design Zinc as a tax strategy. It's around the value that we can deliver from a business perspective to our customers and CVS.

135. On the same call, Alan M. Lotvin, then Executive VP & President of CVS Caremark, stated: "So Zinc is an onshore entity that we created to essentially develop and extract more value out of the pharmaceutical manufacturers on behalf of our customers and clients as part of the purchasing economics that Eva has referenced a couple of times."

136. In a November 6, 2020, earnings call with stock analysts, Larry J. Merlo, then President, CEO & Director of CVS, stated: "And I think it comes back to the stories that we've told countless times in terms of the value that PBMs play in driving down the net cost of pharmaceuticals and the fact that the vast, vast majority of those rebate dollars get passed back to plan sponsors."

137. On November 10, 2021, during the 30th Annual Credit Suisse Healthcare Conference, Shawn Michael Guertin, then Executive Vice President & CFO, stated: "The GPO negotiates all of our commercial rebates for all of our customers and does negotiate those contracts, and they've done great in terms of creating more value for our customers in that classic rebate contracting."

138. In its February 9, 2022 annual Form 10-K filings with the Securities and Exchange Commission, also published on CVS' website, CVS Health Corporation emphasized its role in "minimizing the costs" to its PBM clients, and in making recommendations "that promote the use of lower cost, clinically appropriate drugs and help[] its PBM clients control costs." In these filings,

38

CVS Health Corporation also described the role of its group purchasing organization as "negotiat[ing] pricing for the purchase of pharmaceuticals and rebates with pharmaceutical manufacturers on behalf of its participants."

139.    On June 15, 2022, Shawn Michael Guertin spoke at the Goldman Sachs 43rd Annual Global Healthcare Conference and stated:

- So I think the thing to keep in mind is this [PBM regulatory headwinds] has been looked at multiple times in the past, whether it be at the state or the FTC level, and in all those surveys, they do ultimately conclude that there's a significant effect that the PBMs have on keeping costs down.

- [T]here is a very important role that PBMs play here to keep costs down for employers and individual consumers.

140.    On May 31, 2023, at Bernstein's 39th Annual Strategic Decisions Conference, Shawn Michael Guertin, in response to questions about the FTC and House Committee inquiries into PBMs stated:

- And these investigations in the past have often concluded that it is a very competitive market with very sophisticated consultants and that the PBMs play a very important role in lowering drug prices.  In fact, it's really interesting to think about this issue, and it sounds a little glib, but when you think about it, I think who else in the pharma supply chain, who else is reason for being is to drive cost down for their customers.  And that is the PBM, and that's what the PBMs have done.

- So it's an interesting place to put your regulatory focus when you're trying to drive . . . pharma costs down because that's exactly the mission of the PBM.

- I'm not cavalier about it or dismissive of it.  It's a very serious inquiry at a level that I think is pretty intense.  But I also think it's important to keep in balance the role we play, the adaptability of the PBM model and that the model is shaped a lot by the client desire for how they want the economics.

141.    On September 12, 2023, at the Morgan Stanley 21st Annual Global Healthcare Conference, Karen Sue Lynch stated:

39

- What I would say is as you think about our role as a PBM, we have one role, and that is to reduce the overall cost of drug spend.

- And if you think about what's important for the biosimilar market, is to drive adoption of lower-cost drugs.

- I'll go back to kind of there is a lot of scrutiny of the PBM market. And I think that there's a lot of misunderstanding in what we do as a company. And as I said earlier, our objective and our goal is to reduce the total cost of drugs, and that's really what we're trying to accomplish as a business and as a company. And customers, health plans, employers depend on us to do that.

142. During a December 5, 2023, CVS Investor Day, Karen Sue Lynch stated: "I want to set the record straight on the PBM business model. Contrary to all the misinformation, we have been able to consistently innovate and evolve our business in a very dynamic marketplace. We have done this while continuing to increase the value we deliver to customers by driving down lower net cost. We are the only participant in the drug supply chain that lowers the cost for our customers and our clients. And we have continued to grow over time as our model has undergone fundamental shifts. Caremark has made its mark with a long history of driving consumer innovation and choice."

143. During the same December 5, 2023 Investor Day, Prem S. Shah, then Executive Vice President, Chief Pharmacy Officer and President of Pharmacy & Consumer Wellness of CVS, stated:

- Let me be really clear. We will continue to lower the cost of drugs. It is part of our scale, size and expertise by creating competition. And we're going to continue to pass through our cost of goods improvements in our new model to PBMs and payers in a very transparent fashion. So how will this work? We're going to get paid based on a very transparent formula, cost of drug, plus a clearly defined markup and a patient management fee.

- As noted, we're going to continue to lower the cost of drug – cost of goods and the cost of drugs in our model. We're going to leverage our scale, our size, our expertise in the supply chain. We're going to pass on these improvements in a much more real-time fashion. We're going to provide greater transparency to PBMs and payers. And I firmly believe that this is

40

a crucial building block for PBMs to create a more transparent model downstream for their clients so they can pass this value on to their members. And what I know for sure is our PBM partners also want to drive more transparency for their clients as we move forward.

144. In a January 3, 2024, Press Release titled " CVS Caremark accelerates biosimilars adoption through formulary changes," then Executive Vice President of CVS and President of Caremark, David Joyner, stated "Our customers want to have choices. By preferring biosimilars that have a significantly lower list price than their reference product, CVS Caremark is putting our customers in the driver's seat to best meet the health care needs of their members and lower drug costs."

145. On January 8, 2024, at J.P. Morgan's 42nd Annual Healthcare Conference, Karen Sue Lynch stated:

- We're constantly innovating and evolving our PBM as demonstrated by years of delivery of lower-cost pharmacy cost.

- As they've always done, we expect that PBMs, including Caremark, will continue to thoughtfully incorporate network savings in their–into their contract agreements with their clients, while preserving PBM margins.

- What I would say is we consistently have demonstrated savings with the PBM, right? Time and time again, we've kept the costs low. And my expectation is that with all the data that they've been receiving, I can't imagine a different outcome because we consistently have demonstrated improvement in pharmacy costs for our clients, and that's what we're committed to do.

146. In a February 7, 2024, earnings call with stock analysts, Karen Sue Lynch stated:

- Finally, we continue to drive greater adoption of biosimilars and increase the affordability of these critical specialty drugs for our clients and their members.

- What really excites me is we're leading the way in providing greater transparency in drug pricing and passing through our leading cost of goods through to payers in our new model. So this is not about effectively raising prices. It's about continuing to pass through our size and scale and the acquisition costs that we received back to payers and provide a transparent model that can benefit consumers and payers as we go forward.

147.    On May 14, 2024, Thomas Francis Cowhey, then Executive Vice President & CFO of CVS, spoke at the Bank of America Healthcare Conference and stated: "[W]e know that every time . . . that someone has looked at the PBM, they have decided that and analyzed it and realized that we are the – one of the only participants in the market that is actively trying to drive cost down and that we do that effectively for our customers."

148.    David Joyner, in another press release dated July 23, 2024, and titled "CVS Caremark® defines future of pharmacy benefit management" stated:

- The way we have done our work over the past few decades has driven greater cost savings, better care, and more robust benefits for the Americans we serve.

- Our work is rooted in greater simplicity and transparency for those who pay for pharmacy benefits, for people who take medicine, and for the pharmacies that serve our patients.

- The Caremark Client and Member Pledge includes our commitments to:

    o Deliver greater affordability.  We are dedicated to driving affordability for prescription drugs.  By continuing to promote generics, expand availability of biosimilars, and secure significant discounts on brand-name medications, we ensure Caremark members pay for a 30-day supply of medicine.  This proactive approach is at the heart of what we do.

    o Promote lowest net cost drugs.  We provide choice to our clients who design the benefits that are best for their members, and as part of that work, we continue to promote and advocate for low-list price, low net cost drugs.

    o Change the trajectory of drug costs.  Building on our history of standing with clients and consumers against pharmaceutical company price hikes, we will be the counterweight to stop price gouging.  Through our formulary strategies to drive down costs, we continue to put medicine within reach — like breaking down the patent wall associated with high-priced and providing and broadly available to all Americans.  We will do more.

42

- We all want affordable access to prescription drugs, and Caremark will continue to drive down costs, improve care, and accelerate transparency.

- For our thousands of clients and millions of Americans, Caremark is the difference between affording medicine and going without. We take our commitments to heart and will deliver on our promise to everyone we serve.

149. In an August 7, 2024, earnings call with stock analysts, addressing an interim FTC report critical of PBMs, Karen Sue Lynch stated:

- We fundamentally disagree with the FTC's position. When you look at the data, there is clear evidence that PBM play a crucial role in reducing drug costs. We have a decade-long track record of protecting American businesses, unions and patients from rising prices on prescription drugs. We use competition among manufacturers to help keep drug costs affordable for our members.

- The FTC's report focuses on issues of the past. We are leading the industry as we innovate our business model with our TrueCost offering. We believe our model helps ensure greater transparency in pricing and helps consumers to be confident in their pharmacy benefit that is providing the best possible price.

- What I would say is that we have demonstrated and proven over time that we are saving money and the results reflect that. I think the FTC was kind of very targeted and they took certain data and not the holistic data to really amplify their story versus the real story. And we feel confident that we continue to have discussions. As you can see, nothing has happened in Congress because there's a lot of discussion going on around the PBMs. I do think that if anything ever does happen, it will be on transparency."

- So I think the facts remain clear. The PBM industries and specifically CVS Caremark creates significant value. And I think once the actual empirical evidence is there and actually begins to get passed into those that are actually at the legislative branch and ultimately, those that are actually writing about this industry that will – the numbers will speak for itself.

150. In a November 6, 2024, earnings call with stock analysts, David Joyner stated: "In spite of the intense scrutiny and rhetoric that Caremark and the PBM industry face, we continue to play a crucial role in managing drug costs in this country. I've highlighted the progress we've made on the biosimilar space and our customers continue to see the value that we're delivering with our capabilities."

43

151.     On February 12, 2025, during an earnings call with stock analysts, David Joyner stated:

- One of the most powerful forces helping to offset rising health care costs are PBMs like Caremark. These entities remain the only part of the drug supply chain and entirely focused on lowering costs, but have erroneously been subject to deceptive rhetoric and misinformation. For more than 3 decades, PBMs have been a proven, unequivocal mechanism to negotiate down the price of drugs for payers and consumers while promoting better adherence and better health.

- Our work is a critical counterbalance to the monopolistic tendencies of drug manufacturers. This is why PBMs are needed and why manufacturers fight so hard to limit our capabilities.

- Multiple well-known economists have estimated that PBMs generate net value for the U.S. health care system of over $100 billion per year. No one has demonstrated more success than the PBMs that are driving down drug prices.

- Caremark has been and continues to be a critical solution to help ensure Americans pay less for drugs. We will continue to play our unique role in the drug supply chain, bringing the full breadth of our capabilities and market expertise to reduce drug prices for all customers.

152.     In a May 10, 2023, hearing before the Senate Health Committee, David Joyner stated:

- By negotiating rebates, or discounts, we lower drug costs for our clients and their members where competition exists.

- Transparency starts at the beginning of our client contracting process and is a cornerstone of our approach throughout. Clients . . . understand how their health care dollars are spent. We have always prioritized bringing transparent offerings to the marketplace and today we pass more than 98% of all rebates back to clients.

- We will commit to put the lowest cost product on our formulary—net of discounts and rebates. So, whether it be the low list price or the high list price, our job is to deliver the lowest net cost, post discounts. Discounts off of high, and, or lowest price.

- Today we pass through more than 98 percent of all rebates and discounts to our customers. And 100 percent to Medicare . . . . It goes straight to the customers, which are employers, unions, Governments, etcetera.

44

- We don't pass kickbacks back to our company. We do actually pass through 98 plus percent of our rebates to our customers, retaining a little bit more than 1 percent.

- If it is not on the formulary, it is because it is not the lowest net cost in the therapeutic class."

- We start with using competition to negotiate to the lowest net costs. So, once we do that, that passes on to our employers and government entities, etcetera, in order to manage the benefit.

153. In an interview with the *New York Times*, which published its report on June 21, 2024, David Joyner stated: "The biggest driver of cost in this country is the brand manufacturers . . . . Size and scale really matters in order to be able to influence and be able to lower the overall cost of branded pharmaceuticals."

154. On July 23, 2024, during a hearing before the House Committee on Oversight and Accountability, David Joyner stated:

- We pass over 99 percent of rebates in administrative fees across our book of business, and in Medicare, we pass 100 percent back to the government.

- Today, we pass through 99-plus percent of the rebates to the customer.

- The rebates [from Humira in 2023] were passed through to our customers, the employers, the organizations that fund healthcare in this country, and then they use those dollars, in some cases to pass it on to members. . . . CVS Caremark passes through 99-plus percent of all the rebates that we negotiate with the manufacturers.

### B. Misrepresentations on CVS' Website

155. In 2023, CVS published a PDF of its "Healthy 2030 2023 Impact Report" on its website which states:

- We're committed to enabling access to high quality, convenient and affordable care.

- Championing prescription affordability - We work every day to provide more affordable drug benefits for our CVS Caremark® clients and their plan members.

45

- We are developing a portfolio of products that will facilitate broader access to biosimilars in the U.S. — creating more competition that drives down prices.

156. CVS' website page entitled "Helping enable a more transparent, simple health care system," published at least as early as March 19, 2024, and available as of the filing of this Complaint, states "we are reshaping the future of drug pricing, bringing greater transparency to the system while assuring important access to pharmacy services for Americans."

157. CVS' website page entitled "Prescription drug savings," also published at least as early as March 19, 2024, and available as of the filing of this Complaint, states: "Biosimilar medications, which can treat chronic and severe conditions, help control high drug prices and ensure people have the medications they need to stay healthy. Through CVS Caremark®, CVS Specialty® and Cordavis, we're helping make it easier for people to get access to cost-effective biosimilars."

158. Another CVS website page entitled "Pharmacy Benefit Manager," also published at least as early as March 19, 2024, and available as of the filing of this Complaint, states:

- **What are PBMs -** Pharmacy benefit managers, or PBMs, manage prescription drug benefits for clients ranging from health insurers and Medicare Part D drug plans to large employers. *PBMs are one of the few parts of the prescription drug supply chain specifically dedicated to lowering costs*.

- **How Caremark helps lower costs** - *CVS Caremark® negotiates lower costs for our customers* and expands coverage to affordable medications that people need to stay healthy. *We are transparent about medication costs and prioritize a high quality and more affordable approach to health care.*

- Our approach begins with the latest clinical research, guidelines and best practices — and our formulary decisions are overseen by a committee of independent, unaffiliated clinical pharmacists and physicians.

- Across every therapeutic category, *we strive to achieve low costs for our clients and their members.* That means managing the two fundamental forces behind drug spending: price and utilization.

46

- The basic services PBMs provide include: Negotiat[ing] discounts off prices set by drug manufacturers.

159. CVS' website page contains a PDF titled "CVS Health – Improving Access and Lowering Costs," also published at least as early as 2023, and available as of the filing of this Complaint, which states: "We help people navigate their health care by improving access, lowering costs and being a trusted partner for every meaningful moment of their health. *Our pharmacy benefit manager (PBM) supports this mission by bringing value to consumers and our clients, which include employers, unions and government health plans, by working to lower prescription drug costs.*"

160. Another PDF on CVS' website, titled "5 Facts to Know About PBMs," also published at least as early as 2023, and available as of the filing of this Complaint, states:

- In our work as a pharmacy benefit manager (PBM), CVS Health® works to negotiate lower costs of prescription drugs, going head-to-head with drug manufacturers to remove as many drug pricing challenges as possible for our customers and their members.

- *PBMs are one of the few parts of the drug supply chain that drive down costs for customers.* We negotiate discounts for our customers that help lower the cost of prescription drug coverage . . . .

- PBMs enhance competition in the marketplace. We strive to promote competition among drug manufacturers to help drive down drug costs. PBMs enhance competition through group purchasing and negotiated discounts. We leverage the collective buying power of our members and the availability of competing brand drugs within therapeutic classes to achieve low net costs for clients and their members.

- **The bottom line** - *Our role is to help keep prescription drugs affordable.* Every day, we strive to offer high-quality pharmacy benefits. Without us, prescription drugs would be less affordable and less accessible for the millions of people we serve.

161. A CVS website page entitled "About Us - Our connections make the healthy difference," also published at least as early as March 19, 2024, and available as of the filing of this Complaint, states:

47

- ***Through our scale, expertise, and negotiating power, we can help you drive to low trend and spend across both traditional and specialty drugs. It's our job to go head-to-head with pharmaceutical manufacturers to negotiate the lowest possible prices on behalf of our clients***. By removing as many drug pricing challenges as possible, we can help increase access and adherence, close gaps in care, and lower overall health care spend.

162. CVS Caremark is committed to service excellence and transparency.

**C. Defendants Falsely Told Roofers and Other PBM Customers That Caremark's Formulary and Rebate Decisions Were Based on Helping Customers Control Costs and Achieve Significant Savings**

163. In communications with its PBM customers, Caremark reiterated the same misrepresentations about its formulary design and rebate decisions. Specifically, Caremark routinely told its PBM customers that it would design and manage drug formularies and negotiate with manufacturers to secure rebates to lower Caremark PBM customers' drug expenditures, and that it would be transparent about payments from drug companies.

164. In a January 7, 2022, response to a request for proposals ("RFP") by the Michigan State Civil Service, for example, Caremark claimed:

- We are focused on enhancing access to care, lowering overall health care costs for members and payors, and improving health outcomes.

- Any proposed changes [to the annual formulary] may only improve the rebate guarantees.

- [Caremark] ensure[s] full audit rights, including onsite or remote Rebate audits regardless of whether a Contractor uses a Rebate aggregator

165. In a March 1, 2022, RFP response to the State of Louisiana for its Medicaid program, Caremark stated: "Our approach to becoming the MCO PBM will be to continue the same work we do today and when the new MCO contracts are implemented: . . . transparent pricing."

166. Such promises were emblematic of Caremark's marketing of its PBM services throughout the Class Period.

48

167. Additionally, Caremark sends periodic statements to its PBM customers reporting on rebates received and highlighting their savings on drug spend. These periodic statements are false and misleading because Caremark represented that these statements disclosed all rebates and all savings achieved during these reporting periods. In reality, Caremark concealed the Formulary Manipulation Scheme, which diverted monies that should have been considered rebates to Zinc and excluded savings that would have been realized had Caremark prioritized savings for its PBM customers in its formulary management decisions, rather than drug companies that provide Caremark with bribes and kickbacks.

168. For example, Caremark sends Roofers a "Rebate Quarter Invoice Summary." These documents include information on the total quarterly specialty rebates received from a particular drug company, the client share of those rebates, and Caremark's fees.

169. On February 22, 2023, Caremark sent Roofers its "Rebate Quarterly Invoice Summary Report" for the fourth quarter of 2022. In that document, Caremark reported that the total specialty rebates invoiced from drug companies was $207,056.33, Roofers' share of these rebates was $207,056.33, and the "Caremark Fee" was $0.00.

170. On February 22, 2024, Caremark sent Roofers its "Rebate Quarterly Invoice Summary Report" for the fourth quarter of 2023. In that document, Caremark reported that the total specialty rebates invoiced from drug companies was $278,717.42, Roofers' share of these rebates was $278,717.42, and the "Caremark Fee" was $0.00.

171. On May 22, 2024, Caremark sent Roofers its "Rebate Quarterly Invoice Summary Report" for first quarter of 2024. In that document, Caremark reported that the total specialty rebates invoiced from drug companies was $329,580.64, Roofers' share of these rebates was $329,580.64, and the "Caremark Fee" was $0.00.

49

172. Additionally, on December 8, 2023, Caremark sent Roofers a letter titled "Attn: CVS Rebate Payments." This letter included a "Rebate Distribution Summary" stating that Roofers was entitled to "100%" of rebates and that, from the first quarter of 2020 through the third quarter of 2023, Roofers had been entitled to $7,449,986.92 in rebate payments.

173. On May 29, 2024, Caremark sent Roofers a "Rebate Distribution Summary" for the collection period of the first quarter of 2020 through the first quarter of 2024, which stated that Roofers had been entitled to "100%" of rebate collections, totaling $8,862,406.49.

174. On December 2, 2025, Caremark sent Roofers a document titled "Roofers Union Welfare Trust Local 11 2025 3rd Qtr. Prescription Review" in which Caremark touted the savings that it achieved for Roofers. In this document, CVS reported that Roofers had been entitled to receive $2,109,416 in rebates during the first through third quarters of 2025.

175. Caremark also mailed Roofers checks titled "Attn: CVS Rebate Payments." On February 27, 2023, Roofers received a check for $592,957.72, and a copy of the corresponding invoices underlying that check. Then, Roofers received a check for $669,224.21 from Caremark dated for May 25, 2023, and a copy of the corresponding invoices underlying that check. Roofers also received a $637,711.71 check from Caremark dated for August 25, 2023, and a copy of the corresponding invoices underlying that check. Those invoices reported to Roofers the rebates received on specific drugs.

176. These statements are all misleading because they understate the rebates to which Roofers was entitled by failing to account for monies paid from drug companies to Zinc. Caremark failed to disclose that Roofers would have received much higher rebates if Caremark had not misclassified rebates as other types of fees to divert monies to Zinc.

177. Moreover, the promises that Caremark made to Roofers, other Caremark PBM customers, and potential customers about its lack of improper influence, aversion to bribes and kickbacks, rebate payment transparency, designing of formularies to prioritize low drug costs, and reports to its PBM clients on rebates received were materially false and misleading.

## VI. DEFENDANTS HAVE ESTABLISHED AND OPERATED RICO ENTERPRISES IN FURTHERANCE OF THEIR FRAUDULENT SCHEME

178. To orchestrate their fraudulent scheme, Defendants created, controlled, and operated bilateral association-in-fact RICO enterprises with Zinc and nearly all major drug companies. Through those enterprises, the drug companies agreed to pay bribes and kickbacks, misleadingly described as an array of fees to Zinc, in return for access to Caremark's PBM customers through the drug formularies, favorable formulary placements for their high-price, brand-name drugs, and exclusion of lower-cost competing drugs from the formularies.

179. Each enterprise consists of, on one hand, the CVS entities (Defendants and non-party Zinc), and, on the other hand, a participating drug manufacturer.



180. These RICO enterprises are separate and ongoing business associations that facilitated the coverage determinations, reimbursements, and rebate payments for the drug companies' prescription medications.

181. Further, the drug companies participating in these RICO enterprises were aware of CVS' and Caremark's public statements about Caremark's responsibilities as a PBM. Specifically, the drug companies knew that they were supposed to have arm's-length relationships with Caremark because Caremark's role was to pursue vigorous rebate negotiations with the drug companies on behalf of Caremark PBM customers.

182. In reality, however, the CVS entities (Defendants and Zinc) and each participating drug company have, through each RICO enterprise, continuously pursued a shared unlawful purpose: Caremark would give formulary access and favorable formulary placements to the drug company's medications while excluding competing drugs, in return for the drug company agreeing to make payments to Zinc, for the benefit of the Defendants and at the expense of Caremark's PBM customers like Roofers and other class members. Drug companies knew or should have known that paying such fees to Zinc would enable Defendants to avoid classifying such fees as rebates, and thereby helped Defendants eliminate or materially reduce the amounts Defendants passed on to the Caremark PBM customer Class.

183. The PBM Fraud Enterprises include, but are not limited to:

    a) The **CVS-AbbVie Enterprise**, in which Defendants and non-party Zinc have associated with AbbVie to facilitate coverage determination, reimbursement, and rebate payments for AbbVie's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for AbbVie drugs including Humira, Linzess, Rinvoq, and Skyrizi.

    b) The **CVS-Amgen Enterprise,** in which Defendants and non-party Zinc have associated with Amgen to facilitate coverage determination, reimbursement, and rebate payments for Amgen's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM

customers in return for favorable formulary placements for Amgen drugs including Enbrel, Repatha, and Otezla.

c)  The **CVS-AstraZeneca Enterprise,** in which Defendants and non-party Zinc have associated with AstraZeneca to facilitate coverage determination, reimbursement, and rebate payments for AstraZeneca's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for AstraZeneca drugs including Symbicort, Farxiga, Lynparza, and Brilinta.

d)  The **CVS-Bayer Enterprise,** in which Defendants and non-party Zinc have associated with Bayer to facilitate coverage determination, reimbursement, and rebate payments for Bayer's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for Bayer drugs like Xarelto.

e)  The **CVS-BMS Enterprise,** in which Defendants and non-party Zinc have associated with BMS to facilitate coverage determination, reimbursement, and rebate payments for BMS's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for BMS drugs including Eliquis, Sprycel, and Zeposia.

f)  The **CVS-Boehringer Enterprise,** in which Defendants and non-party Zinc have associated with Boehringer to facilitate coverage determination, reimbursement, and rebate payments for Boehringer's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for Boehringer drugs including Glyxambi, Jardiance, and Spiriva.

g)  The **CVS-Eli Lilly Enterprise,** in which Defendants and non-party Zinc have associated with Eli Lilly to facilitate coverage determination, reimbursement, and rebate payments for Eli Lilly's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for Eli Lilly drugs like Trulicity.

h)  The **CVS-Gilead Enterprise,** in which Defendants and non-party Zinc have associated with Gilead to facilitate coverage determination, reimbursement, and rebate payments for Gilead's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for Gilead drugs including Biktarvy, Descovy, Harvoni, and Vosevi.

i)  The **CVS-J&J Enterprise,** in which Defendants and non-party Zinc have associated with J&J to facilitate coverage determination, reimbursement, and

rebate payments for J&J's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for J&J drugs including Erleada and Tremfya.

j) The **CVS-Merck Enterprise,** in which Defendants and non-party Zinc have associated with Merck to facilitate coverage determination, reimbursement, and rebate payments for Merck's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for Merck drugs including Isentress, Januvia, and Verquvo.

k) The **CVS-Novartis Enterprise,** in which Defendants and non-party Zinc have associated with Novartis to facilitate coverage determination, reimbursement, and rebate payments for Novartis's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for Novartis drugs including Gilenya, Kesimpta, and Xolair.

l) The **CVS-Novo Nordisk Enterprise,** in which Defendants and non-party Zinc have associated with Novo Nordisk to facilitate coverage determination, reimbursement, and rebate payments for Novo Nordisk's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for Novo Nordisk drugs including Ozempic, Tresiba, and Victoza.

m) The **CVS-Pfizer Enterprise,** in which Defendants and non-party Zinc have associated with Pfizer to facilitate coverage determination, reimbursement, and rebate payments for Pfizer's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for Pfizer drugs including Cibinqo, Eliquis, Eucrisa, and Ibrance.

n) The **CVS-Sanofi Enterprise,** in which Defendants and non-party Zinc have associated with Sanofi to facilitate coverage determination, reimbursement, and rebate payments for Sanofi's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from Caremark PBM customers in return for favorable formulary placements for Sanofi drugs including Aubagio, Cerezyme, Dupixent, Lantus, and Toujeo.

184. Each of these RICO enterprises has existed as a business association separate from the pattern of unlawful racketeering activities alleged. Each RICO enterprise, for example, engaged in prescription drug coverage determination, prescription drug reimbursement, and drug

54

rebate payment activities separate and apart from its involvement in Defendants' scheme of accepting bribe and kickback payments in return for favorable formulary inclusion and placement.

185. Alongside these non-racketeering activities, however, the participants in each of these RICO enterprises have been bound together by unlawful agreements and understandings about the payment of bribes and kickbacks in return for favorable formulary inclusion and placement and the diversion of drug rebates from Caremark's PBM customers to Zinc.

186. Specifically, each drug company participating in each RICO enterprise has agreed to pay fees to Zinc in exchange for access, and often preferred access via favorable formulary placement, to Caremark's PBM customers. While those fees are nominally described to Caremark PBM customers as being for data collection, rebate administration, and similar services, they are in fact bribes and kickbacks intended to benefit Defendants in return for Caremark granting favorable formulary inclusion and placement to each drug company's brand-name, high-priced medications.

187. Further, as an aspect of each RICO enterprise, Defendants, non-party Zinc, and the participating drug company also agreed and understood that the payment of exorbitant fees to Zinc by the drug company would directly result in reductions to the amount of rebates and discounts that Caremark shared with Roofers and the Class. In other words, the drug company and the CVS entities (Defendants and Zinc) understood that the fees paid to Zinc for formulary access were contrary to Caremark's obligations and representations to Roofers and the Class because they diverted payments that would otherwise be shared with them and increased Caremark PBM customers' drug spend.

188. In furtherance of these unlawful agreements and understandings, the participants in each of the RICO enterprises communicated and coordinated their actions, including through

discussions about how to structure the bribe and kickback payments to Zinc, the amounts of such unlawful payments, and the formulary placements that Caremark would assign to each participating drug company's drugs in return for the unlawful payments.

189. By leveraging Caremark's negotiating power as the PBM for Roofers and the Class, Defendants have controlled and operated each of these RICO enterprises, including by directing the flow of the unlawful bribes and kickbacks and by giving favorable formulary inclusion and placement to each participating drug company's medications.

190. Finally, in furtherance of Defendants' unwritten, unlawful agreements with the drug companies participating in these RICO enterprises, Defendants, in their role as key participants in each of the PBM Fraud Enterprises, have consistently and repeatedly made misrepresentations and omitted material facts to Roofers and the Class.

191. Specifically, Defendants, rather than disclosing that Caremark's formulary inclusion and placement decisions were made in return for bribes and kickbacks from the participating drug companies, have falsely represented to Roofers and the Class that they were receiving all the rebates and administrative fees due to them pursuant to their contracts with Caremark and that formulary decisions have been made to help manage or reduce Caremark PBM customers' prescription drug expenditures.

A.  **In Furtherance of Defendants' Fraudulent Scheme, Each of the PBM Fraud Enterprises Made False and Misleading Statements**

192. To execute the Formulary Manipulation Scheme, each of the PBM Fraud Enterprises has made and used numerous false and misleading statements and records during the Class Period, including, but not limited to:

a) Defendants' misrepresentations to Roofers and the Class and the public that Caremark managed drug formularies, including its standard formularies, with the goal of lowering drug costs for its Caremark PBM customers;

56

b) Defendants' misrepresentations that the status or inclusion in Caremark's standard formularies was based only on the drugs' safety, efficacy, and/or cost-effectiveness, as determined by Caremark's formulary committees;

c) Defendants' misrepresentations to Roofers and the Class and the public that Caremark conducted rebate negotiations with drug companies—including, specifically, the drug companies participating in the PBM Fraud Enterprises—to reduce the Caremark PBM customers' prescription drug expenditures;

d) Defendants' misrepresentations to Roofers and the Class and the public that Caremark was transparent regarding its negotiations with drug companies, including the drug companies participating in the PBM Fraud Enterprises, and payments from those drug companies;

e) False or misleading rebate agreements between Caremark and the drug companies participating in the PBM Fraud Enterprises that improperly conceal the material fact that the drug companies were receiving favorable formulary placements in return for bribes and kickbacks paid to Zinc;

f) False or misleading agreements between Zinc and the drug companies participating in the PBM Fraud Enterprises that wrongly attributes the inflated fees paid by the drug companies to services actually rendered by Zinc, rather than as bribes and kickbacks in return for favorable formulary placements; and

g) False or misleading periodic statements sent from Caremark to Roofers and the Class purporting to identify all rebates Roofers and the Class had been entitled to receive in connection with drug purchases.

## VII. CAREMARK BREACHED ITS OBLIGATION TO TREAT ITS PBM CUSTOMERS FAIRLY AND IN GOOD FAITH

193. In addition to the obligations specified in its PBM contracts with Caremark PBM customers, Caremark has an additional obligation to treat its PBM customers fairly and in good faith. As relevant here, this encompasses an obligation not to drive up Caremark PBM customers' prescription drug costs either by diverting payments from drug companies to Zinc, selling formulary access and favorable formulary placements for high-price, brand-name drugs in return for bribes and kickbacks from drug companies, or excluding cost-effective drugs from the formularies because they compete with and/or cost less than the drugs made by Defendants' co-conspirators.

194. This obligation is clear from CVS's Code of Conduct, which recognizes that Caremark owes a duty of "fair dealing" with "our customers." Specifically, CVS's Code of Conduct defines this duty of fair dealing to include to refrain from "any conduct or sales or other practice that is intended to mislead, manipulate, or take unfair advantage" of Caremark PBM customers like Roofers.

195. As relevant here, and as discussed above, CVS and Caremark have consistently marketed their PBM services to Caremark PBM customers by proclaiming that Caremark plays "a critical role in the healthcare system by negotiating lower net costs for our customers."

196. According to CVS' explanation of "What are PBMs" on its website, "PBMs are one of the few parts of the prescription drug supply chain specifically dedicated to lowering costs." CVS' website further assured Caremark PBM customers that "[Caremark] bring[s] value to consumers and our clients, which include employers, unions and government health plans, by working to lower prescription drug costs."

197. CVS also assured customers that "PBMs enhance competition through group purchasing and negotiated discounts. We leverage the collective buying power of [Caremark's] members and the availability of competing brand drugs within therapeutic classes to achieve low net costs for clients and their members."

198. As alleged above, Caremark systematically and continually abused its position of trust and violated its obligation to treat Caremark PBM customers fairly and in good faith by giving favorable formulary placements for high-price, brand-name drugs in return for bribes and kickbacks from drug companies to its affiliate, Zinc. This conduct diverted manufacturer rebates that would otherwise have been passed on to Roofers and the Class pursuant to their contracts with Caremark to Zinc.

## VIII.  CLASS ACTION ALLEGATIONS

199.     Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of a class consisting of:

> All entities in the United States of America and its territories, including health insurance companies, health maintenance organizations, self-funded health and welfare benefit plans, third party payors, and any other health benefit providers, that paid or incurred costs for Caremark's services that were inflated as a result of Defendants' fraudulent scheme, from March 18, 2020 to the present, and suffered damages thereby. Excluded from the Class are (i) employees of Defendants, including their officers or directors, and subsidiaries and affiliates; and (ii) successors or assigns, and any entity in which Defendants have or had a controlling interest.

200.     The members of the Class are so numerous that joinder of all members is impracticable.  The Class consists of all health insurance companies, health maintenance organizations, self-funded health and welfare benefit plans, and any other health benefit providers in the United States that did not receive the benefits of the PBM services they paid for and were wrongfully induced to pay higher costs for PBM-related services as a consequence of Defendants' fraudulent scheme during the Class Period. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class.  Class members may be identified from records maintained by Defendants and may be notified of this class action using a form of notice similar to that customarily used in class actions.

201.     Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of in this action.

202.     Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and in RICO and fraud-related litigation.

59

203.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

a) whether Defendants' acts and omissions violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c);

b) whether Defendants conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d);

c) whether Defendants disseminated false or misleading statements to conceal that the PBM Fraud Enterprises were secretly profiting at the expense of Caremark PBM customers;

d) whether Defendants controlled and manipulated formularies to incentivize higher-priced drugs;

e) whether Defendants mischaracterized and reclassified rebates to hide the substantial sums being exchanged and pocketed by their PBM and affiliated GPO;

f) whether Defendants created a fraudulent GPO to conceal rebates and fees from Caremark's customers;

g) whether Defendants' acts and omissions described in this Complaint constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1962;

h) whether Defendants administered an "enterprise," within the meaning of 18 U.S.C. § 1962;

i) whether Defendants' acts or omissions described in this Complaint affected interstate commerce;

j) whether Defendants' acts or omissions described in this Complaint were in breach of their contractual obligations to the Class;

k) whether Defendants' acts or omissions described in this Complaint were in breach of an implied covenant of good faith and fair dealing; and

l) whether Defendants' acts or omissions described in this Complaint directly and proximately caused injury to Plaintiff and the Class.

204.     Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is available respecting the Class as a whole.

205.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small, so that the burden and expense of individual litigation makes it impossible for those members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## IX.     CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C)—RACKETEERING

206.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 205 above, as though fully set forth here.

207.     18 U.S.C. § 1962(c) provides, in relevant part:

> "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity [. . .]"

208.     Defendant CVS and Defendant Caremark both are "persons" within the meaning of 18 U.S.C. § 1962(c), because each is an "entity capable of holding a legal or beneficial interest in property[.]" *See* 18 U.S.C. § 1961(3).

209.     The PBM Fraud Enterprises are association-in-fact enterprises consisting of, on one hand, the Defendants, and, on the other hand, nearly all major drug companies that have paid bribes and kickbacks to Zinc in return for access to favorable placement on Caremark's formularies.  As set forth above, *see supra* ¶¶ 178-191, the PBM Fraud Enterprises have included, but are not limited to:

       a)  the CVS-AbbVie Enterprise

b) the CVS-Amgen Enterprise

c) the CVS-AstraZeneca Enterprise

d) the CVS-Bayer Enterprise

e) the CVS-BMS Enterprise

f) the CVS-Boehringer Enterprise

g) the CVS-Eli Lilly Enterprise

h) the CVS-Gilead Enterprise

i) the CVS-J&J Enterprise

j) the CVS-Merck Enterprise

k) the CVS-Novartis Enterprise

l) the CVS-Novo Nordisk Enterprise

m) the CVS-Pfizer Enterprise

n) the CVS-Sanofi Enterprise

210. While each PBM Fraud Enterprise is involved in certain legitimate activities such as facilitating drug coverage determination, reimbursement, and rebate payments, each Enterprise also has, during the Class Period, operated with at least one key unlawful purpose — to channel bribes and kickbacks from the participating drug company to CVS through Zinc, under the disguise of "rebate administration" and other fee payments, in return for favorable formulary placements.

211. Defendant CVS and Defendant Caremark are separate legal entities, and Defendants are each distinct from each of the PBM Fraud Enterprises.

**A.** **Defendants' Control of the PBM Fraud Enterprises' Affairs**

212. In 2020, at the start of the Class Period, Defendant CVS and Defendant Caremark were directly involved in establishing each of the PBM Fraud Enterprises. Specifically, Defendants created Zinc as a subsidiary of CVS in order to use Zinc as the channel through which

payments from the participating drug companies can be diverted into Defendants' coffers without disclosure or proper payment to Caremark PBM customers like Roofers.

213. Throughout the Class Period, Defendant CVS and Defendant Caremark each has exerted control over each of the PBM Fraud Enterprises by leveraging Caremark's ability to control the drug formularies for Roofers and the Class and, thereby, determine how likely the brand-name drugs marketed by each of the participating drug companies is to be used by beneficiaries of those TPPs.

214. Further, Defendant CVS and Defendant Caremark each have conducted or participated in the specific aspects of the affairs of each of the PBM Fraud Enterprises, including by:

    a) Demanding and obtaining bribes and kickbacks from each participating drug company in return for giving favorable formulary placements to one or more of that drug company's brand-name, high-priced drugs on Caremark's formularies;

    b) Excluding drugs from formularies to limit competition and/or remove lower-cost alternatives for the drugs made by Defendants' co-conspirators;

    c) Misrepresenting and/or concealing from both Roofers and the Class and the public the real reasons for Caremark's formulary inclusion and placement decisions;

    d) Channeling the bribes and kickbacks into Defendants' coffers through Zinc by creating agreements and records that falsely characterize the bribes and kickbacks as rebate administration and other fees paid to Zinc for bona fide services;

    e) Misrepresenting and/or concealing from both Roofers and the Class and the public Caremark's actual goals in its rebate negotiations with the drug companies that have participated in the PBM Fraud Enterprises; and

    f) Misrepresenting to Roofers, the Class, and the public the transparency of Caremark's rebate negotiations and its fee arrangements with the participating drug companies.

## B. Defendants' Pattern of Racketeering Activity

215. Defendant CVS and Defendant Caremark each have conducted and participated in the affairs of the each of the PBM Fraud Enterprises through a pattern of racketeering activity under 18 U.S.C. § 1961.

216. Specifically, Defendant CVS and Defendant Caremark each have committed or aided and abetted the commission of numerous acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. § 1343, within the past 10 years.

217. Defendant CVS' and Defendant Caremark's predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) consisted of violations of the wire fraud (18 U.S.C. § 1343) statute.

218. Specifically, in furtherance of their fraudulent scheme, Defendant CVS and Defendant Caremark directed each of the PBM Fraud Enterprises to engage in and affect interstate commerce by conducting activities across state boundaries, which include, but are not limited to: negotiating agreements concerning fees, rebates, and formulary placements; communicating with Caremark PBM customers like Roofers about prescription drug costs, formulary design, and rebates; and transmitting and receiving invoices and data concerning prescription drug coverage, reimbursements, and fee and rebate payments.

219. Through these activities, Defendant CVS and Defendant Caremark participated in prescription drug coverage determinations, prescription drug reimbursements, and fees and rebate payments affecting Caremark PBM customers and their beneficiaries throughout the United States, including in this District.

220. To execute their fraudulent scheme and to carry out the activities in furtherance of their fraudulent scheme, Defendant CVS and Defendant Caremark caused each of the PBM Fraud Enterprises to regularly transmit documents, data, and other information using interstate wire

64

facilities. Among other things, each of the PBM Fraud Enterprises used interstate wire facilities to transmit the following types of communications:

a) Written and oral communications among members of each PBM Fraud Enterprise conditioning, negotiating, and confirming the payment of bribes and kickback to Defendants through Zinc in return for favorable formulary placements;

b) Written agreements between Zinc and the participating drug company in each PBM Fraud Enterprise that falsely and/or misleadingly conceal the true purpose of the payments to Zinc under those agreements: to secure favorable formulary placements for the drug company;

c) Prescription benefit management contracts between Caremark and the Class that falsely and/or misleadingly conceal Caremark's side agreements with the drug companies that participate in the PBM Fraud Enterprises to give favorable formulary placements in return for bribes and kickbacks to Defendants through Zinc;

d) Written communications, including checks, wires and/or other payment mechanisms, relating to purported "rebate administration" and other fee payments to Zinc, that were, in actuality, bribes and kickbacks from the drug companies participating in the PBM Fraud Enterprises to Defendants to secure favorable formulary placements; and

e) Invoices and other requests for payment from Caremark to Roofers and the Class for covering prescription drugs for their beneficiaries.

f) Marketing materials and proposals sent to existing and potential Caremark PBM customers promising cost savings and periodic reports sent to existing customers regarding cost savings achieved and/or delivered by Caremark.

221.    Through their control and participation in each of the PBM Fraud Enterprises, Defendant CVS and Defendant Caremark have regularly violated 18 U.S.C. § 1343 by conducting a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, using the interstate wire facilities. As alleged above, Defendants have done so by, *inter alia*, negotiating agreements concerning fees, rebates, and formulary placements; communicating with Caremark PBM customers like Roofers about prescription drug costs, formulary design, and rebates; transmitting and receiving invoices and

65

data concerning prescription drug coverage, reimbursements, and fee and rebate payments; and making misrepresentations to Caremark's PBM customers about Caremark's rebate negotiation process, its formulary inclusion and placement decisions, its sharing of rebates with Caremark PBM customers, and the transparency of these processes and decisions.

222. Defendants also have violated 18 U.S.C. § 1343 by using the interstate wire facilities to conceal both the corrupt bribe and kickback arrangements between Zinc and the drug companies participating in the PBM Fraud Enterprises by falsely and misleadingly labeling rebate payments from the drug companies as fee payments to Zinc and the amounts and nature of those payments from Roofers, the Class, and the public.

223. Defendant CVS and Defendant Caremark each knowingly and intentionally made or caused to be made the misrepresentations concerning the rebate negotiation process, Caremark's formulary inclusion and placement decisions, the sharing of rebates with Caremark PBM customers, the transparency of these processes and decisions to conceal these facts from Roofers, the Class, and the public. Defendant CVS and Defendant Caremark each knew or recklessly disregarded that these were material misrepresentations and/or omissions.

**C. Defendants' Operation of the Formulary Manipulation Scheme Through the PBM Fraud Enterprises Injured, and Continues to Cause Injury to, Business or Property of Roofers and the Class**

224. Defendants' pattern of racketeering activity and violations of the wire fraud statute have caused each member of the Class, Caremark's PBM customers like Roofers, to be injured in its business or property.

225. By accepting bribes and kickbacks paid from drug companies to Zinc in exchange for access to and favorable placement of drugs on Caremark's formularies, Defendants diverted rebates and fees that would otherwise have been passed through to Roofers and the Class.

66

226.    Additionally, by giving favorable formulary placements to high-price, brand-name drugs in return for bribes and kickbacks as part of their wire fraud scheme, Defendants have raised prescription drug costs for Caremark PBM customers.  Roofers and the Class have had to pay more to Caremark during the Class Period for prescription drug coverage for their beneficiaries, and received lower rebates and more restricted drug formularies from Caremark, than they would had Defendants not engaged in the Formulary Manipulation Scheme.  Under 18 U.S.C. § 1964(c), Defendant CVS and Defendant Caremark are, respectively, jointly and severally liable to the Class for three times the damages that members of the Class have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**COUNT II**

**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(D)—RACKETEERING CONSPIRACY**

227.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 205 above as though fully set forth here.

228.    The conspiracy provision of the RICO statute, 18 U.S.C. § 1962(d), states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

229.    Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). Specifically, the object of the conspiracy has been and is to orchestrate a bribery and kickback fraud scheme through Defendants' control and operation of the PBM Fraud Enterprises.

230.    As set forth in detail above, including, specifically, in the RICO allegations in paragraphs 178-191, Defendants each knowingly agreed to orchestrate the bribery and kickback fraud scheme through one or more of the PBM Fraud Enterprises; and each Defendant has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.

231. Specifically, Defendants agreed to and received through Zinc inflated fees from the drug companies participating in the PBM Fraud Enterprises; Defendants agreed to and provided, in return, favorable placements to the participating drug companies' high-price, brand-name drugs in Caremark's drug formularies; and Defendants repeatedly made false or misleading statements or material omissions concerning Caremark's formulary decisions and rebate negotiations.

232. The nature of each Defendant's acts, material misrepresentations, and material omissions in furtherance of this conspiracy creates an inference that each Defendant both agreed to participate in a RICO conspiracy in violation of 18 U.S.C. § 1962(c) and was aware that its ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

233. Each Defendant has systematically engaged in, and continues to engage in, the commission of overt acts in furtherance of their bribery and kickback fraud scheme through the PBM Fraud Enterprises, including, but not limited, to violations of the wire fraud statute, 18 U.S.C. § 1343.

234. Defendants' conspiracy to engage in these systematic predicate violations are continuing and will continue. Plaintiff and the Class have been injured in its property by reason of Defendants' conspiracy and the predicate violations in furtherance of that conspiracy. Specifically, Defendants' RICO conspiracy has caused Plaintiff and the Class to pay more to Caremark for prescription drug coverage for their beneficiaries by reducing their shares of rebate and fee payments from drug companies and by driving up the cost of drug coverage.

235. By reason of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages they have sustained, plus the cost of this action, including reasonable attorneys' fees and costs.

## COUNT III

## BREACH OF CONTRACT

236. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 205 above, as though fully set forth here.

237. Since January 2019, Roofers has maintained a Prescription Benefit Services Agreement with Caremark (the "Caremark PBM Services Agreement"). As such, the Caremark PBM Services Agreement, as amended, is a valid and binding contract between Caremark and Roofers and is supported by consideration.

238. Most terms of Roofers' Caremark PBM Services Agreement are not unique to Roofers; rather, they are part of the standardized contract used by CVS and Caremark with Caremark's PBM customers. Caremark even included a footer in Roofers' agreement specifying that "the information contained herein are confidential [and] proprietary" to CVS/Caremark.

239. Section 7.1 of the Caremark PBM Services Agreement in effect in 2019 specified that Caremark would "contract with pharmaceutical companies for Rebates as a group purchasing organization for the [Caremark PBM customer]." When Defendants amended the Caremark PBM Services Agreement in late 2021, *i.e.*, over a year after they had created Zinc to divert rebate payments, Defendants again stated, in Section 7.2 of the agreement, that Caremark "may elect, in its discretion to pursue Rebates as a group purchasing organization for the [Caremark PBM customers]." To emphasize Caremark's responsibility to pursue rebates for Caremark PBM customers, Section 7.2 further specified that "CVS/Caremark shall have the exclusive right to pursue rebate on drugs dispensed to Plan Participants" and expressly prohibited Caremark PBM customers from using any GPO other than Caremark "for the purpose of obtaining rebates or discounts related to the drug utilization of Plan Participants."

69

240.     In addition, under Section 7.4 of the Caremark PBM Services Agreement, Caremark further promised Caremark PBM customers like Roofers that while CVS, Caremark, and their affiliates "may receive and retain compensation" from pharmaceutical companies, such compensation is only "for the provision of services, such as care management, program administration, adverse event and other data reporting, and fulfillment services," rather than for Caremark exploiting and manipulating its control of drug formularies of its Caremark PBM customers.

241.     However, despite Caremark's repeated assurances to its PBM clients that it does not consider compensation from drug companies in formulary placement, Caremark used Zinc to secretly receive compensation, in the form of bribes and kickbacks, and such compensation directly impacted Caremark's formulary decisions.

242.     As such, Caremark's conduct in giving formulary access and favorable formulary placements for high-price, brand-name drugs in return for bribes and kickbacks from drug companies to its affiliate, Zinc, constitutes an express breach of Roofers' Caremark PBM Services Agreement as well as Caremark's contracts with the other members of the Class.

243.     As a result, Roofers and the Class have been damaged; and they are entitled to recover the diverted rebates that Defendants have misclassified as "bona fide service fees," and the higher costs they incurred due to formulary placements made by Caremark in return for the bribes and kickbacks from the drug companies received by Defendants, as well as interest thereon.

## COUNT IV

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

244.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 205 above, as though fully set forth here.

70

245. Every contract includes an implied covenant of good faith and fair dealing. As relevant here, CVS's own Code of Conduct defines its duty of fair dealing to include refraining from "any conduct or sales or other practice that is intended to mislead, manipulate, or take unfair advantage" of Caremark PBM customers like Roofers.

246. Caremark used its discretion to create standard formularies for Caremark PBM customers by giving favorable formulary placements for high-price, brand-name drugs in return for bribes and kickbacks from drug companies to its affiliate, Zinc, constitutes bad faith and unfair dealing.

247. Specifically, Caremark violated the implied covenant of good faith and fair dealing because, instead of passing all rebates and manufacturer administrative fees paid by drug companies in connection with formulary access and placement, Caremark diverted those payments from drug companies into Zinc's coffers.

248. As part of its contractual duty to design formularies for Caremark PBM customers, Caremark was required to discharge its duties in good faith. But, instead of negotiating in good faith with pharmaceutical manufacturers on behalf of Plaintiff and the Class, Caremark used its discretion to design a pay-to-play scheme with drug companies that effectively limited the types of drugs available on its formularies, excluding numerous generic drugs in favor of more expensive equivalents, which served only to enrich Caremark and drug manufacturers at the expense of Caremark PBM customers like Plaintiff and its plan members.

249. As a result, Plaintiff and the Class have been damaged and are entitled to recover the payments diverted to Zinc and the higher costs they incurred due to formulary placements made by Caremark in return for bribes and kickbacks, as well as interest thereon.

## COUNT V

## UNJUST ENRICHMENT

250. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 205 above, as though fully set forth here.

251. By giving formulary access and favorable formulary placements for high-price, brand-name drugs in return for drug companies diverting payments from Caremark to Zinc, Defendants caused Roofers and the class to overpay Caremark by improperly depriving Roofers and the Class of their rightful share of the rebate and fee payments from drug companies.

252. As a result, Defendants were unjustly enriched by their misconduct, and Roofers and the Class conferred a benefit on Defendants solely because Defendants improperly caused drug companies to divert payments from Caremark to Zinc.

253. Defendants understood, accepted, and retained the benefits conferred by Roofers and the Class. They also took steps to conceal the Formulary Manipulation Scheme while retaining the benefits derived from the scheme.

254. It would be inequitable and unjust for Defendants to retain the benefits of their misconduct, including the payments they caused drug companies to divert from Caremark to Zinc.

255. Roofers and the Class have suffered financial harm from Defendants' misconduct and are entitled to damages, including the restitution and disgorgement of the payments that Defendants improperly diverted from Caremark to Zinc, in an amount to be established at trial, plus interest thereupon.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that this Court:

1. Declare the action to be a proper class action under Fed. R. Civ. P. 23;

72

2. Award Plaintiff and the Class damages, in an amount to be proven at trial, including interest;

3. Award Plaintiff and the Class their reasonable costs and expenses, including attorneys' fees; and

4. Award such other relief as the Court deems just and proper.

## XI. JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Dated: March 18, 2026

Respectfully submitted,

/s/ K. Joseph Shekarchi

**BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP**
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, IL 60601
Telephone: (312) 373-3800
Facsimile: (312) 794-7801
avi@blbglaw.com

-and

Michael D. Blatchley
Peter Russell
Haley J. Tobin
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
michaelb@blbglaw.com
peter.russell@blbglaw.com
haley.tobin@blbglaw.com

**SHEKARCHI LAW OFFICES**
K. Joseph Shekarchi (Bar No. 4493)
51 Jefferson Blvd, Suite 400
Warwick, RI 02866
Tel: (401) 827-0100
Fax: (401) 823-1400
joe@shekarchilaw.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Joseph H. Meltzer
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
jmeltzer@ktmc.com
tziegler@ktmc.com

**CARELLA BYRNE CECCHI BRODY AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
Zachary A. Jacobs
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com
decklund@carellabyrne.com
zjacobs@carellabyrne.com

73

**BISHOP PARTNOY**
ROBERT E. BISHOP
(bobby@bishoppartnoy.com)
FRANK PARTNOY
(frank@bishoppartnoy.com)
1717 K Street, NW, Suite 900
Washington, D.C. 20006
(202) 787-5769

*Counsel for Roofers' Unions Welfare Trust Fund*